USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1838

 UNITED STATES,

 Appellee,

 v.

 DWAYNE OWENS,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Boudin and Stahl, Circuit Judges.
 
 

 Miriam Conrad, Federal Public Defender, for appellant.
 Deborah Watson, Attorney, with whom Donald K. Stern, United
States Attorney, Theodore B. Heinrich, Assistant United States
Attorney, and Allison D. Burroughs, Assistant United States
Attorney, were on brief for appellee.

March 2, 1999

 
 

 STAHL, Circuit Judge. Following a twenty-one day trial,
a jury convicted defendant-appellant Dwayne Owens on a number of
serious charges including murder, racketeering, cocaine
distribution, being a fugitive in possession of a firearm, and
money laundering. In this appeal, Owens challenges his convictions
on various grounds. After a careful review of the record and
Owens's arguments, we affirm.
 I. Prior Proceedings and Appellate Issues
 On May 14, 1996, a grand jury returned a twenty-seven
count indictment against Owens and others. Underlying this
indictment was the government's allegation that, from 1988 to 1995,
Owens ran a large-scale drug enterprise that obtained cocaine from
suppliers in New York and Florida for distribution in
Massachusetts. The government also accused Owens of possessing
numerous handguns, resorting to violence and threats of violence to
protect his drug interests, and of the murder of one Rodney Belle,
who had double-crossed him in a drug deal.
 Prior to trial, Owens moved to suppress the fruits of a
search of his home at 26 Parsons Avenue in East Providence, Rhode
Island and a search of an automobile in which he was a passenger,
conducted on an interstate highway in Memphis, Tennessee. In
addition, he requested a hearing pursuant to Franks v. Delaware,
438 U.S. 154 (1978) (holding that the Fourth Amendment entitles a
defendant to a hearing if he establishes a prima facie case that a
search warrant affidavit included knowingly or recklessly false
statements). Although the district court denied Owens's request
for a Franks hearing, it did conduct a six-day evidentiary hearing
on the motions to suppress, concluding that most of the objected to
evidence was properly seized.
 When the case was submitted to the jury, Owens was the
sole remaining defendant. He was convicted on all charges
pertaining to the murder of Rodney Belle, conspiracy to murder
Rodney Belle, violations of the Racketeering Influenced Corrupt
Organization ("RICO") Act, RICO conspiracy, interstate travel in
aid of RICO, conspiracy to possess and distribute cocaine, using
and carrying a firearm during a crime of violence, being a fugitive
from justice in possession of a firearm, and money laundering. The
jury acquitted him on a number of other charges. The district
court sentenced Owens to life imprisonment. 
 On appeal, Owens makes a number of arguments which fall
into three main categories. First, he challenges the district
court's denial of his motions to suppress. Second, he argues that
there was insufficient evidence to support his RICO convictions. 
Finally, he contends that the court delivered a number of flawed
jury instructions. 
 We discuss each issue in turn after setting forth in
context the relevant underlying facts.
 II. The Suppression Motions
 A. Standard of Review
 We review a district court's factual findings for clear
error. See United States v. McCarthy, 77 F.3d 522, 525 (1st Cir.),
cert. denied, 117 S. Ct. 771 (1996). Where specific findings are
lacking, we view the record in the light most favorable to the
ruling, drawing all reasonable inferences in support of the
challenged ruling. See id. at 529. We review a district court's
legal conclusions de novo. See United States v. Carty, 993 F.2d
1005, 1008 (1st Cir. 1993). In the end, we defer to a district
court's denial of a suppression motion, so long as it is supported
by any reasonable view of the evidence. See id.
 B. 26 Parsons Avenue Search
 1. Background
 In May 1995, Boston police notified East Providence
police that a man known as Don Miley, alias Dwayne Owens, was
wanted for homicide in Boston, and that an accomplice of this man
was cooperating with the police. This accomplice gave Boston
police information about the suspect's drug trafficking activities
and described his residence in East Providence. On May 18, 1995,
East Providence Police Captain Joseph Broadmeadow submitted an
affidavit in support of an application for a warrant to search
Owens's home at 26 Parsons Avenue. The warrant was granted and
authorized police to search for "a black male, age 32, known as Don
Miley, alias Dwayne Owens, alias [sic] with a date of birth of 6-9-
63, also firearms, ammunition." The police executed the warrant on
May 19, during Owens's absence from the residence, and seized
extensive evidence including not only guns, ammunition, illegal
drugs, and drug paraphernalia, but also personal documents, some of
which were found in manila folders and envelopes.
 Owens's motion to suppress the fruits of this search
argued (1) that the warrant application failed to establish
probable cause and the good-faith exception to the exclusionary
rule did not apply; and (2) that the police exceeded the scope of
their search. As an adjunct to his suppression motion, he also
moved for a Franks hearing. 
 The district court granted in part and denied in part
Owens's suppression motion, ruling that the warrant application
established probable cause to search for firearms and ammunition,
and that even if probable cause to search did not support the
warrant, most of the items seized were admissible under the "good-
faith exception" recognized in United States v. Leon, 468 U.S. 897,
922 (1984) (holding that evidence seized in reasonable good-faith
reliance on a search warrant, which is later found defective, may
be admitted at trial). As to the scope of the search, the court
determined that certain evidence was properly seized because it was
in plain view and immediately apparent as evidence of a crime or as
evidence that would help lead to the apprehension of Owens, whom
the officers reasonably believed was a fugitive. Although the
court granted Owens's motion with respect to some items seized
during the search, ruling that these documents were not immediately
apparent as relevant evidence, in the end, it admitted most of the
seized items, including the drugs, drug paraphernalia, and certain
personal documents. The court denied Owens's request for a Frankshearing, finding that Owens failed to make a substantial
preliminary showing that Officer Broadmeadow's affidavit contained
any deliberately false or recklessly false statements.
 2. Discussion
 On appeal, Owens renews the two arguments made in his
motion to suppress. He also contends that the district court
improperly denied his request for a Franks hearing. We disagree.
 a. Probable Cause and Leon's Good-Faith
 Exception
 
 Assuming arguendo that the warrant for 26 Parsons Avenue
was not supported by probable cause, we agree with the district
court that the executing officers reasonably relied in good faith
on a facially valid warrant. We therefore need not assess the
constitutionality of the warrant and simply hold that the district
court committed no error in denying the motion to suppress. SeeLeon, 468 U.S. at 925 (courts have discretion to consider the issue
of officers' good faith without first addressing Fourth Amendment
issue).
 There are four exclusions to the Leon good-faith
exception: (1) "when the magistrate . . . was misled by information
in an affidavit that the affiant knew was false or would have known
was false except for his reckless disregard for the truth;" (2)
"where the issuing magistrate wholly abandoned his [detached and
neutral] judicial role;" (3) where the affidavit is "so lacking in
indicia of probable cause as to render official belief in its
existence entirely unreasonable;" and (4) where a warrant is "so
facially deficient -- i.e. in failing to particularize the place to
be searched or the things to be seized -- that the executing
officers cannot reasonably presume it to be valid." Id. at 923. 
Owens contends that the 26 Parsons Avenue search implicates the
first and fourth exclusions.
 i. False Information in Affidavit
 According to Owens, the affidavit improperly misled the
magistrate in three respects. First, it claimed that the Boston
police had a murder warrant for Don Miley when in fact the murder
warrant identified the suspect only as Dwayne Owens. Second, it
misstated that business records indicated Be Be's Barbecue was
"owned and incorporated by Don Miley" when Don Miley was only
listed in corporate documents as Vice President. And third, its
statement that phone number 436-6658 was located at 26 Parsons
Avenue improperly omitted that the number listed was in the name of
Johnny Stephens, not Don Miley. 
 Owens's claims fail because he cannot establish that
these misstatements were either knowingly false or reckless. At
most, Broadmeadow's errors resulted from negligence, and
"[a]llegations of negligence or innocent mistake are insufficient." 
Franks, 438 U.S. at 171.
 Moreover, even if any of the misstatements were knowingly
false or reckless, we do not see how they were material. SeeUnited States v. Vanness, 85 F.3d 661, 662-63 (D.C. Cir. 1996)
(warrant valid under Leon because false statement not material). 
The affidavit's statement that a warrant existed for "Miley,"
rather than "Owens," was immaterial because the affidavit also
indicated that the subject known as "Miley" used the alias "Owens." 
Nor can the statement that Miley was named in business records as
owner rather than Vice President be characterized as material
because, in either event, the suspect was linked to Be Be's
Barbecue. Cf. State v. Groff, 323 N.W.2d 204, 210 (Iowa 1982)
(stating that defendant "owns" land on which marijuana is growing,
rather than that "he farms the land," is not materially false). 
Finally, the affidavit's failure to recite that telephone number
436-6658 was listed in the name of Johnny Stephens was not material
under the circumstances. Police questioning of the landlord of 26
Parsons Avenue had already established that a man known as Miley
was living at that address. It was immaterial whether Miley was
living there alone or with others. 
 ii. Facially Deficient Warrant
 According to Owens, it was unreasonable for the executing
officers to rely on a warrant that he characterizes as so facially
deficient as to be "bare bones." In particular, Owens complains
that the affidavit demonstrated neither the recency of the
information relied upon nor a nexus between the firearms and 26
Parsons Avenue. We disagree.
 Despite Owens's complaints, the affidavit was
sufficiently current because it stated that an "active warrant"
existed for Owens, that an informant "is cooperating" (emphasis
added) with Boston police, and that the informant described a Cole
Street address as "being used" (emphasis added) by Owens in his
drug business. From this, the executing officers could reasonably
have inferred that the informant's data were recent and described
an ongoing drug operation and access to firearms. Cf. United
States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (affidavit
not stale because references by informant were in the present tense
and therefore implied regular ongoing transactions); United Statesv. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) ("[I]t is common
ground that drug conspiracies tend to be ongoing operations,
rendering timely information that might, in other contexts, be
regarded as stale."). 
 Owens's complaint that the affidavit failed to establish
any nexus between the firearms and 26 Parsons Avenue similarly
fails. The affidavit recited that Owens was wanted for murder, had
"numerous firearms," and rented a house at 26 Parsons Avenue. 
Based on this information, it was reasonable for the executing
officers to believe that firearms would be found at 26 Parsons
Avenue. Cf. United States v. Procopio, 88 F.3d 21, 28 (1st Cir.)
(nexus between evidence of crime and address to be searched
sufficiently established where affidavit recited that suspect lived
at that address), cert. denied, 117 S. Ct. 620 (1996).
 b. The Scope of the Search
 Owens concedes that if the police were lawfully present
at 26 Parsons Avenue, as we have just concluded, then the firearms
and ammunition were properly seized within the scope of the search
warrant, and the drugs and paraphernalia were properly seized
pursuant to the plain view doctrine. He contends, however, that
the police officers exceeded the proper scope of the search when
they seized various personal documents which were not in plain
view.
 A plain view seizure is lawful if (1) the seizing officer
has a prior justification for being in a position to see the item
in plain view and (2) the evidentiary value of the item is
immediately apparent. See Horton v. California, 496 U.S. 128, 136
(1990). According to Owens, the officers improperly seized various
personal documents because the evidentiary value of these documents
was not "immediately apparent." In particular, Owens contests the
seizure of the following documents, which were introduced as
evidence at trial: address books, telephone bills, papers
containing names and numbers, money order receipts, documents
regarding gun purchases by Andrea Frith Jones, a photograph of
himself with a pile of money, and a birth certificate for Donald
Miley. Together, these documents helped the government establish
that Owens had engaged in years of drug trafficking; had access to
and used guns in connection with his drug enterprise; had access to
large amounts of money; and used an alias. 
 Owens's argument that the seizure of these items exceeded
the scope of the authorized search is not without force. But,
assuming arguendo that the seizure of various documents was
unlawful, the admission of such evidence at trial was harmless
error beyond a reasonable doubt. See Milton v. Wainwright, 407
U.S. 371, 372-73 (1972) (stating that where the jury, in addition
to hearing erroneously admitted testimony, is "presented with
overwhelming evidence of petitioner's guilt," error is harmless
beyond a reasonable doubt). The seized documents merely
corroborated the damaging and voluminous testimony which the
government introduced at trial. Four participants in the
enterprise testified that Owens and his colleagues engaged in years
of drug trafficking. Eight witnesses variously testified that they
had purchased weapons for Owens; Owens carried a weapon with him
almost all the time; Owens was seen with weapons on various
occasions; and Owens kept numerous weapons in his apartment. Five
witnesses testified that they had seen Owens with large amounts of
cash on a number of occasions. And finally, the testimony of three
witnesses amply established that Owens used the alias Don Miley. 
In admitting the documents, the district court's error, if any, was
harmless beyond a reasonable doubt.
 c. Franks Hearing
 Owens also contends that the court improperly denied his
motion for a Franks hearing. As we have stated, under Franks, a
defendant may overcome the presumption that a warrant affidavit is 
valid by making a "substantial preliminary showing that a false
statement knowingly and intentionally or with reckless disregard
for the truth, was included by the affiant in the warrant
affidavit." 438 U.S. at 155-56. For the reasons discussed supraat Part II-B-2-a-i, we see no clear error in the district court's
determination that Owens failed to make a substantial preliminary
showing that the affidavit contained knowingly false or reckless
statements. See United States v. Parcels of Land, 903 F.2d 36, 46
(1st Cir. 1990) (a district court's determination that the
requisite showing for a Franks hearing is reviewed for clear
error). Thus, we affirm the district court's denial of Owens's
motion for a Franks hearing.
 C. Tennessee Automobile Stop
 1. Background
 On November 13, 1995, Patrolman Andy Boyd of the Shelby
County Sheriff's Office stopped a Black Ford Thunderbird for
speeding on a highway in Memphis, Tennessee. Owens was a passenger
in that car. Boyd asked the driver, Devone Robinson, for his
driver's license, and Robinson responded that he did not have his
license with him. Boyd then asked Robinson to step out of the
Thunderbird and into the patrol car so that he could do a license
check. Robinson complied.
 Next, Boyd separately questioned Robinson and Owens, and
received conflicting responses from both men. For instance, when
Boyd asked Robinson where he was from, Robinson responded that he
lived in North Carolina, even though he had earlier stated that he
was from Massachusetts and Virginia. In response to Boyd's request
for Owens's name, Owens responded "Robert." Robinson, however,
stated that his passenger was named "Jay." The two also gave
conflicting accounts of who owned the car. Robinson first stated
that it belonged to Jay, then later stated that it belonged to
Jay's friend. Owens, meanwhile, provided police with a vehicle
registration showing the owner to be Kenneth Allen, whom Owens
identified as his brother-in-law.
 These contradicting statements having raised his
suspicions, Boyd requested assistance, and Sergeant Mark Kellerhall
arrived shortly on the scene. The officers then called for a drug
dog, which had to be transported from the airport at the other side
of the city. They also initiated a vehicle registration check,
criminal history checks, and a National Crime Information Center
("NCIC") check to determine whether the car was stolen. 
 About fourteen minutes into the stop, Robinson admitted
that his Virginia driver's license had been suspended, a fact that
the police radio channel confirmed five minutes later. Boyd then
arrested Robinson for driving without a license. Normal procedure
for the Shelby County Sheriff's Office dictates that when the
driver-owner of a car is arrested, he is asked to sign a form
authorizing the car's release to a passenger. In this case,
however, the registered owner was not present, and the police
continued to receive conflicting responses from the driver and the
passenger regarding ownership of the car. After his arrest,
Robinson changed his earlier position and stated, while pointing to
Owens, that the car belonged to "Kenny." Under these
circumstances, the officers elected to await the results of the
vehicle registration check and other inquiries to determine whether
Owens had actual authority to drive the car. They did so even
after a computer check revealed that the license provided by Owens,
alias Davis, was valid.
 About 29 minutes into the stop, the officers received the
results of the criminal history checks, which indicated that
Robinson had a cocaine possession charge, and that the registered
owner, Kenneth Allen, had two cocaine trafficking charges and an
armed robbery charge. The officers also received the results of
the NCIC check, indicating that the vehicle had not been reported
stolen. Boyd nonetheless waited for the results of the vehicle
registration check rather than permit Owens to drive away because
he believed that stolen cars did not always appear on the NCIC
database.
 About 49-50 minutes into the stop, while the officers
were still waiting for the results of the vehicle registration
check, the canine unit arrived. The police had the drug dog,
Torque, conduct a sniff test on the outside of the vehicle. Torque
alerted to the car, indicating the presence of drugs. The officers
thereupon searched the car and found, in a secret compartment, a
loaded .40 caliber Ruger, a .380 Cobray Uzi, ammunition for the
Uzi, over $16,000 in cash, and several address and ledger books. 
The police seized all the objects in the compartment. The
government introduced this evidence at trial. Subsequent clinical
tests on the car revealed no drugs and no drug residue.
 Owens moved to suppress the evidence seized in this
search, arguing: (1) the length of the investigative stop made the
stop an unlawful detention; (2) the drug dog was unreliable, so the
officers lacked probable cause to search the car for contraband;
and (3) even if the search was, at bottom, lawful, the officers
exceeded its scope in seizing the address books and ledgers. 
 The district court denied Owens's motion. The court
found that Officer Boyd had properly stopped the Thunderbird for
speeding and arrested Robinson for driving without a license. The
court also ruled that the officers were justified in detaining the
Thunderbird during the time they investigated whether Owens had
actual authority to drive the car. In evaluating the propriety of
the dog sniff, the court reasoned that exposing the outside of the
car to a dog sniff did not implicate the Fourth Amendment, and once
the dog alerted to the car, the officers had probable cause to
search the interior. Rejecting Owens's argument that the officers
exceeded the lawful scope of their search, the court held that the
search was appropriate as to all items seized from the secret
compartment. 
 2. Discussion
 Owens contends that the district court erred in denying
his motion, and renews on appeal the arguments presented in his
motion to suppress. Again, we disagree with Owens's contentions.
 a. The Length of the Stop
 In evaluating the propriety of the Tennessee stop, we
apply a two-prong test. First, we must determine whether the
"officer[s'] actions were justified at [their] inception," and if
so, "whether the actions undertaken by the officer[s] following the
stop were reasonably responsive to the circumstances justifying the
stop in the first place as augmented by information gleaned by the
officer[s] during the stop." United States v. Sowers, 136 F.3d 24,
27 (1st Cir.), cert. denied, 119 S. Ct. 105 (1998).
 Owens does not challenge the initial automobile stop for
speeding as invalid under Terry v. Ohio, 392 U.S. 1 (1968). 
See Berkemer v. McCarty, 468 U.S. 420, 439 (1984) ("[T]he usual
traffic stop is more analogous to a so called 'Terry stop' . . .
than to a formal arrest."). Rather, he contends that the fifty-
minute detention was too long in duration to be justified as an
investigative stop. Thus, his argument hinges on whether the
length of the detention converted the otherwise valid investigative
stop into a de facto arrest for which probable cause was lacking. 
 The reasonableness inquiry is almost always fact
specific. See United States v. Zapata, 18 F.3d 971, 975 (1st Cir.
1994) (noting that "[t]here is no scientifically precise formula
that enables courts to distinguish between valid investigatory
stops and de facto arrests"). The Supreme Court has directed
courts making this inquiry to examine
 whether the police diligently pursued a means
 of investigation that was likely to confirm or
 dispel their suspicions quickly, during which
 time it was necessary to detain the defendant. 
 A court making this assessment should take
 care to consider whether the police are acting
 in a swiftly developing situation, and in such
 cases the court should not indulge in
 unrealistic second-guessing.

United States v. Sharpe, 470 U.S. 675, 686 (1985) (citations
omitted).
 The fifty-minute detention was indeed a lengthy one, and
in other circumstances would perhaps weigh in favor of finding a defacto arrest. A long duration, however, does not by itself
transform an otherwise valid stop into an arrest. See McCarthy, 77
F.3d at 530 (stating that "there is no talismanic time beyond which
any stop initially justified on the basis of Terry becomes an
unreasonable seizure under the [F]ourth [A]mendment") (citation
omitted). Here, the period of detention was justified. The
officers necessarily spent the first twenty minutes trying to
ascertain whether Robinson had a valid driver's license, which he
did not. It was only after arresting Robinson that the officers
faced the problem of whether to permit Owens to drive a car that he
did not own. Moreover, events unfolded in such a manner as to
raise the officers' suspicions regarding Owens's authority to drive
the car: Robinson and Owens gave conflicting stories about who
owned the car and Owens was evasive and avoided eye-contact during
police questioning.
 In responding to the circumstances, the officers
diligently pursued a means of investigation that would dispel their
suspicions. They initiated a number of computer checks on the car
and its occupants and reasonably awaited the results. Cf. United
States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990)
(holding that detention of defendants' vehicles was reasonable
during time that officers completed inspections of defendants'
documents); United States v. Walker, 933 F.2d 812, 816 n.2 (10th
Cir. 1991) (suggesting in dicta that length of detention would have
been reasonable if police were waiting for results of an NCIC,
license, or registration inquiry). 
 Under these particular facts, the detention was not a defacto arrest and the district court's finding that the officers
responded reasonably to the circumstances as they developed is
supported by the evidence.
 b. Reliability of Drug Dog
 The existence of probable cause based on an alert by a
drug dog depends upon the dog's reliability. See United States v.
Race, 529 F.2d 12, 14 (1st Cir. 1976). During the suppression
hearing, Owens and the government introduced conflicting evidence
regarding Torque's reliability. Owens offered the testimony of Dr.
Dan Craig, an expert on animal behavior, who, after reviewing
records of Torque's failure to pass two certification tests as well
as his training and performance, concluded that Torque was not
reliable in vehicle searches.
 The government introduced the testimony of Mark
Robertson, the training supervisor for the Shelby County Sheriff's
drug interdiction team, who offered explanations for Torque's
failure in the certification tests. Robertson claimed
responsibility for Torque's first failure, stating that he had
prematurely entered the then newly trained dog in a national test
against top dogs. He attributed Torque's second failure to handler
error. He also emphasized that Torque was certified at the time of
the Tennessee stop. In the end, Robertson testified that Torque
was an extremely reliable dog, and that Torque and his handler were
among the best. Torque's handler, Carrole Owen, also testified for
the government, and opined that Torque's reliability was excellent. 
 The district court ultimately credited the government's
testimony and determined that Torque was sufficiently reliable to
support a finding of probable cause. With due deference to the
district court's greater ability to gauge the demeanor and
credibility of the witnesses, we cannot say that the court's
finding was clearly erroneous. 
 c. Seizure of Address Books
 Finally, Owens asserts that even if the police officers
had probable cause to search the car, they wrongly seized address
books and notebooks, which were outside the scope of the plain view
doctrine because their incriminating nature was not immediately
apparent. 
 Owens's arguments are misplaced: officers who have
probable cause to search a car for contraband are not limited in
the scope of their search by the plain view doctrine. See United
States v. Ross, 456 U.S. 798, 800 (1982). Rather, "[i]f probable
cause justifies the search of a lawfully stopped vehicle, it
justifies the search of every part of the vehicle and its contents
that may conceal the object of the search." Id. at 825.
 Here, the officers had probable cause to believe that the
automobile contained drugs and evidence of drug trafficking. The
address books and notebooks were concealed in a secret compartment,
together with a large amount of cash, two guns, and ostensibly a
residue of drugs. Under these circumstances, the police had
probable cause to believe that the address books and notebooks were
evidence of drug trafficking and thus properly seized them. 
 III. Sufficiency of the Evidence
 A. Standard of Review
 Owens argues that his RICO convictions must be set aside
because the government offered insufficient proof of the
"enterprise" charged in the indictment and of Owens's participation
in that enterprise. In considering Owens's sufficiency claims, we
must "view the evidence, together with all reasonable inferences
that may be drawn therefrom, in the light most favorable to the
government, . . . [and consider] whether a rational trier of fact
could have found guilt beyond a reasonable doubt." United Statesv. Loder, 23 F.3d 586, 589 (1st Cir. 1994) (citations and internal
quotation marks omitted). After examining the evidence under this
standard, we reject Owens's arguments.
 B. Background Facts
 The indictment charged Owens and one Keillen Smith with
being leaders of an enterprise, consisting of individuals
"associated in fact," which operated from 1988 to 1995 and engaged
in drug trafficking and acts of violence, including murder. The
alleged purpose of the enterprise included "enriching members
through drug trafficking and drug distribution;" "preserving,
protecting and expanding the power and control of the enterprise
through the use of murder, violence, threats of violence, and
intimidation;" and "promoting and enhancing the enterprise and its
members' drug trafficking and related activities." 
 During trial, the government introduced evidence that
Owens and Smith were the major players in an organization, made up
of two sub-groups, that supplied cocaine to the Boston area. 
Owens, assisted by Johnny Stephens, Robert Owens, and Coleman
Essex, was in charge of supplying the organization with cocaine. 
Smith, assisted by Kenneth Allen, Anthony Lewis, Charles Brown,
Wayne Meadows, and Gordon Lowe, was responsible for packaging and
distributing the cocaine in the Boston area.
 Owens first began selling cocaine to Smith in ounce
quantities in 1987. By 1990, Smith had become a large-scale
distributor for Owens, purchasing and reselling cocaine by the
kilogram. Owens continued to sell cocaine to Smith even after
Owens left Boston and began to move from state to state in order to
avoid arrest. In early 1991, Owens relocated to Providence, Rhode
Island, where he continued his drug trafficking activities until
his arrest in 1995. While in Providence, Owens sold cocaine to
Smith on a near weekly basis for $20,000 to $25,000 a kilogram. 
Although Smith sometimes personally collected the drugs from Owens,
he usually had Lewis, Brown, or Meadows travel to Rhode Island from
Massachusetts to pick up kilogram quantities. The men would return
with the drugs in Owens's Thunderbird, which Owens had outfitted
with hidden compartments. In Boston, Smith and his group "cooked"
the cocaine, packaged it, and distributed it to customers, making
a profit of $2,500 to $5,000 for every kilogram sold. Smith's
group therefore relied on Owens's group for a steady supply of
cocaine, and Owens's group correspondingly depended on Smith's
group for cash. The two groups collaborated on drug deals in other
meaningful ways. Owens was often accompanied by members of both
groups as he traveled to Florida and New York to purchase cocaine;
and on at least one occasion, Smith and Owens jointly contributed
$100,000 to finance a drug buying trip to Florida, which was made
by Owens and Lewis.
 Owens's and Smith's groups also relied on one another as
they resorted to violence to protect their drug interests. On two
occasions, when Owens's New York source provided cocaine that Owens
deemed unacceptable, Owens and Smith, accompanied by other gang
members, drove to New York to obtain redress. On one of these
trips, the men were armed with guns provided by Owens. The first
trip was a success as Owens and Smith, at gunpoint, extracted a
refund from the source. The second "refund" trip was unsuccessful. 
On yet another occasion, when Rodney Belle's cohorts stole cocaine
from Owens during a drug deal, Owens turned to Smith and Lewis for
help, directing Smith to determine who was responsible for the
theft. When Smith and Allen learned that Belle was responsible,
Smith told Lewis to set up a meeting with Belle, purportedly to
purchase guns. During the meeting, Owens, assisted by Lewis,
Stephens, and Lowe, killed Belle.
 C. Discussion
 Owens contends that the evidence suggested two separate
and autonomous enterprises, one directed by Owens and the other
directed by Smith. He points to testimony that Smith received less
than half of his cocaine from Owens and did not know all of Owens's
buyers. According to Owens, the government therefore failed to
establish the existence of the enterprise charged in the
indictment. We disagree. 
 The term "enterprise" in the RICO statute includes "any
individual, partnership, corporation, association, or other legal
entity, and any union or group of individuals associated in fact
although not a legal entity." 18 U.S.C. 1961(c). An
"association in fact" type of enterprise can consist of two illegal
entities. Cf. United States v. London, 66 F.3d 1227, 1243 (1st
Cir. 1995) (holding that "two or more legal entities can form or be
part of an association-in-fact RICO enterprise") (emphasis in
original); United States v. Turkette, 452 U.S. 576, 585 (1981)
(holding that RICO applies to wholly illegal enterprises). To
prove an enterprise, the government must introduce "evidence of an
ongoing organization, formal or informal, and . . . evidence that
the various associates function as a continuing unit." Id. at 583. 
Where two sub-groups are at issue, "what is necessary is evidence
of systemic linkage, such as overlapping leadership, structural or
financial ties, or continuing coordination." Libertad v. Welch, 53
F.3d 428, 443 (1st Cir. 1995).
 Here, the government introduced sufficient evidence of
systemic linkages between Owens's and Smith's organizations. 
Members of the two groups depended on one another both financially
and structurally. They regularly exchanged money for cocaine,
coordinated in the transporting of cocaine to Boston, accompanied
one another on cocaine buying trips, and assisted one another in
acts of violence to protect their drug interests. Based on this
evidence, a reasonable jury could have found, beyond a reasonable
doubt, the existence of the enterprise charged in the indictment. 
Compare Libertad, 53 F.3d at 443-44 (two organizations constituted
one RICO enterprise when one organization issued a press release
referring to second organization as "affiliated group;" leaders of
second organization "shared information" with first organization on
a regular basis; and both organizations participated in one protest
together); with United States v. Bledsoe, 674 F.2d 647, 667 (8th
Cir. 1982) (no enterprise where evidence showed two separate
associations of individuals, with no common personnel, except one
defendant who was a member of both organizations at different
times).
 That Smith received less than half of his cocaine from
Owens and did not know all of Owens's buyers does not detract from
the existence of the enterprise because RICO does not "demand total
fusion or that all defendants participate in all racketeering
activities, know of the entire conspiratorial sweep, or be
acquainted with all other defendants." Libertad, 53 F.3d at 445
(citation omitted) (discussing RICO conspiracy count). 
Accordingly, the government sufficiently proved the existence of an
enterprise.
 Owens's related argument, that the evidence was
insufficient to show that he conducted or participated in the
affairs of the enterprise, also fails because, as discussed supra,
the evidence more than sufficiently established that Owens
conducted and participated in the affairs of the enterprise.
 IV. Adequacy of the Jury Instructions
 Owens challenges the adequacy of the district court's
jury instructions in three respects. He claims that the court
erred by: (1) failing to honor a promise to defense counsel
regarding jury instructions on the elements of a violation under 18
U.S.C. 1962(c) (conduct and participation in RICO enterprise),
and disregarding Supreme Court precedent on the proper
interpretation of the statute; (2) giving an improper instruction
on the proof necessary to show a pattern of racketeering activity;
and (3) incorrectly instructing the jury on the elements of proof
for 18 U.S.C. 1956(a) (money laundering). We discuss each
argument in turn.
 A. Conduct and Participation in Enterprise
 
 Owens's first argument stems from his interpretation of
18 U.S.C. 1962(c) and Reves v. Ernst & Young, 507 U.S. 170, 183
(1993). Section 1962(c) provides that it shall be unlawful for a
person "to conduct or participate, directly or indirectly, in the
conduct" of an enterprise's affairs through a pattern of
racketeering activity. 18 U.S.C. 1962(c) (emphasis added). The
indictment against Owens charged him with, inter alia, controlling,
heading, and directing a RICO enterprise, rather than simply
conducting or participating in the enterprise. Defense counsel
highlighted this fact during the charge conference and,
accordingly, requested the district court to instruct the jury that
a conviction under 18 U.S.C. 1962(c) must be premised on a
finding that Owens "directed" the enterprise and not on a finding
that he merely "conducted or participated" in the affairs of such
enterprise. The government objected, arguing that directing the
enterprise is not an element of the offense. The district court
offered a compromise to which both parties assented:
 I think I can tie the government to the
 indictment but nevertheless properly frame the
 elements if I add in the concept lower down in
 the paragraph: A person may be found to
 participate in the conduct of the enterprise
 even though he has no part in the management
 or control of the enterprise. But here, the
 government has charged, and it must prove,
 whatever language I find there in the
 indictment.

 When the court instructed the jury with respect to this
issue, it began by stating that
 [w]hen you come to evaluate the evidence with
 respect to those things that I tell you must
 be proved beyond a reasonable doubt, you can
 check against the indictment to see what [the
 government] ha[s] specifically charged. The
 case has to be proved in the manner that it
 was indicted. That's the charge that they
 have made.
 
But then, after giving additional instructions covering fourteen
pages of the transcript, the court advised the jury that
 [t]he third [RICO] element is the requirement
 that the evidence demonstrate beyond a
 reasonable doubt that [Owens] conducted or
 participated in the conduct of the
 enterprise's affairs by engaging in a pattern
 of racketeering activity. The term conduct
 and participate in the conduct of an
 enterprise includes the performance of acts,
 functions or duties which are related to the
 [operation] of the enterprise. A person may
 be found to participate in the conduct of the
 enterprise even though he has no part in the
 management or control of the enterprise.
(emphasis added). Owens objected to this instruction and requested
that the district court instruct the jury in accordance with what
it said at the charge conference, i.e., that the government must
prove Owens had some role in directing the affairs of the
enterprise. The district court declined to alter its instruction. 
 Owens argues that the court's failure to instruct as he
requested constitutes reversible error under Fed. R. Crim. P. 30. 
In relevant part, Rule 30 provides:
 At the close of the evidence or at such
 earlier time during the trial as the court
 reasonably directs, any party may file written
 requests that the court instruct the jury on
 the law as set forth in the requests . . . .
 The court shall inform counsel of its proposed
 action upon the requests prior to their
 arguments to the jury.
When a court fails to honor the dictates of Rule 30, reversal is
warranted if defense counsel's closing argument was prejudicially
affected. See United States v. Porter, 764 F.2d 1, 11 (1st Cir.
1985). 
 It is a close question whether the district court
violated Rule 30. The court did, after all, tell the jury that the
case must be "proved in the manner that it was indicted." 
Nonetheless, by first telling the jury that it must look to the
indictment and then, quite a bit later, instructing it on the
elements of 18 U.S.C. 1962(c), the court may well have left the
jury with the impression that Owens need not have directed the
enterprise. But assuming that the court's actions violated Rule
30, Owens has not explained how defense counsel's closing arguments
were prejudiced.
 To show prejudice, Owens must establish that he "was
unfairly prevented from arguing [his] defense to the jury or was
substantially misled in formulating and presenting arguments." 
United States v. Foppe, 993 F.2d 1444, 1451 (9th Cir. 1993)
(quoting United States v. Gaskins, 849 F.2d 454, 458 (9th Cir.
1988)). Here, Owens has neither specified a defense theory the
court's promise led him to forego, nor explained how his closing
arguments would have differed had the court instructed in precise
accordance with his request. Nor is it obvious to us what Owens's
counsel otherwise might have done. Hence, the Rule 30 violation,
if any, led to no apparent prejudice. 
 Owens's next argument, that the court's instructions on
the 18 U.S.C. 1962(c) offense were in conflict with Reves, also
fails. Reves addressed the question whether "one must participate
in the operation or management of the enterprise itself to be
subject to liability under [18 U.S.C. 1962(c)]." 507 U.S. at
183. The Supreme Court has answered this question by holding that
a party outside a RICO enterprise is only liable if he or she
participates in the operation or management of the enterprise. Seeid. at 179. Reves's analysis does not apply where a party is
determined to be inside a RICO enterprise. See United States v.
Houlihan, 92 F.3d 1271, 1298-99 (1st Cir. 1996), cert. denied, 117
S. Ct. 963 (1997); United States v. Gabriele, 63 F.3d 61, 68 (1st
Cir. 1995); United States v. Hurley, 63 F.3d 1, 9 (1st Cir. 1995),
cert. denied, 517 U.S. 1105 (1996); United States v. Oreto, 37 F.3d
739, 751 (1st Cir. 1994).
 There is no question that Owens was an insider to the
RICO enterprise. Owens supplied Smith with one to two kilograms of
cocaine per week, and the two groups acted in concert with one
another on several occasions to facilitate their joint interests
(e.g., murdering Rodney Belle). Because Owens was not an outside
contractor to the RICO enterprise, Reves is inapposite. The
court's instruction accorded with circuit precedent. 
 B. Proof Necessary to Show a "Pattern of Racketeering
 Activity"
 Owens also argues that the district court incorrectly
instructed the jury on the proof necessary to show a "pattern of
racketeering activity" under 18 U.S.C. 1962(c). The district
court instructed that, to establish a "pattern of racketeering
activity" under RICO, the government must prove that Owens's
racketeering acts "are related or that they amount to or pose a
threat of continued criminal activity." Owens argues, and the
government concedes, that Supreme Court precedent requires proof
that the racketeering acts are related and that they amount to or
pose a threat of continued criminal activity. See H.J. Inc. v.
Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). Owens
therefore correctly asserts that the disjunctive should have been
conjunctive.
 Owens, however, failed to object to this instruction in
the district court, and we therefore review only for plain error
under Fed. R. Crim. P. 52(b). See Johnson v. United States, 520
U.S. 461, 466 (1997); United States v. Olano, 507 U.S. 725, 734
(1993). For Rule 52(b) to apply, an error or defect raised for the
first time on appeal must be "plain," meaning "clear" or "obvious,"
and it must have "affect[ed] substantial rights," meaning, in most
cases, "[i]t must have affected the outcome of the district court
proceedings." Olano, 507 U.S. at 734. Even then, error correction
under Rule 52(b) is entirely discretionary, and should be exercised
only when an error "seriously affects the fairness, integrity or
public reputation of judicial proceedings." Id. at 736. 
 Moreover, the Supreme Court has made it clear that where
the government sets forth essentially uncontroverted evidence that
overwhelmingly supports a conviction, the conviction should stand
unless the defendant makes a plausible argument that the
instructional error affected the verdict. See Johnson, 520 U.S. at
466. At trial, the government presented evidence that
overwhelmingly demonstrated Owens's involvement in large-scale drug
trafficking and with associated violence from 1988 to the time of
his arrest in 1995. Moreover, the evidence all but compelled the
conclusion that Owens would have continued to engage in such
activities had the police not intervened by arresting him and
ending the enterprise. Thus, there is a wealth of evidence to
support the conclusion that Owens's racketeering acts were related
and posed a threat of continued criminal activity (i.e., "pattern
of racketeering"). We therefore decline to find plain error under
Rule 52(b). 
 C. Money Laundering
 Finally, Owens argues that the court's instructions
improperly relieved the government of proving an essential element
of the money laundering offense because it erroneously instructed
the jury that it was not necessary to find that his financial
transactions (i.e., drug sales) actually affected interstate
commerce in order to convict him under 18 U.S.C. 1956(a) (money
laundering).
 To prove the offense of money laundering, the government
must show, inter alia, that the defendant engaged in a financial
transaction that affected interstate commerce. See 18 U.S.C.
 1956(c)(4). A minimal effect on interstate commerce is
sufficient to support a conviction. See United States v. Juvenile
Male, 118 F.3d 1344, 1349 (9th Cir. 1997). If, however, there is
no effect on interstate commerce, conviction is not proper. SeeUnited States v. Grey, 56 F.3d 1219, 1225 (10th Cir. 1995).
 The district court's instruction to the jury was, in
relevant part, as follows:
 Now, it's not necessary for the government to
 show that Mr. Owens actually intended or
 anticipated an effect on interstate commerce
 or even that interstate commerce was actually
 affected. What is necessary is that it be the
 natural and probable consequence of his
 actions to affect interstate commerce, no
 matter how minimally. 
 
 (emphasis added). The government contends that this instruction
did not constitute reversible error because, as a whole, the
instructions made clear that the financial transactions at issue
must have had at least a minimal effect on interstate commerce.
 We have some difficulty with the government's position. 
The express language of the instruction informed the jury that it
was not necessary to find that Owens's financial transactions
affected interstate commerce to convict him of money laundering
under 18 U.S.C. 1956(a). Thus, the instructions were reasonably
likely to have understated the government's burden of proof.
 Again, however, Owens failed to object to the district
court's instruction. Thus, once again we review for plain error. 
See Johnson, 520 U.S. at 466; Olano, 507 U.S. at 734. And again,
the error does not warrant recognition under Fed. R. Crim. P.
52(b).
 Underlying the charge for money laundering was the
allegation that Owens used proceeds generated from his drug sales
to purchase Be Be's Barbecue. The government introduced evidence
that overwhelmingly established that the money for Be Be's was
generated as members of the enterprise transported cocaine from
Providence to Boston, sold the cocaine, and returned to Providence
with the revenue. These transactions occurred on a weekly basis. 
Thus, by finding Owens guilty of money laundering, the jury
necessarily found that Owens's activities had an effect on
interstate commerce. Cf. Russell v. United States, 471 U.S. 858,
862 (1985) (stating that the rental of real estate is
unquestionably an activity that affects interstate commerce);
United States v. Westbrook, 119 F.3d 1176, 1192 (5th Cir. 1997)
(purchase of two cars with proceeds of a cocaine sale affects
interstate commerce), cert. denied, 118 S. Ct. 1059 (1998); United
States v. Gallo, 927 F.2d 815, 822-23 (5th Cir. 1991)
(transportation on interstate highway of drug trafficking proceeds
affects interstate commerce). 
 V. Additional Claims
 Owens makes a number of additional claims on appeal, none
of which merits more than brief mention. First, Owens argues that
the district court abused its discretion in accepting co-defendant
Johnny Stephens's guilty plea after, rather than before, delivering
its preliminary instructions to the jury. We see no such error. 
Cf. United States v. Chapdelaine, 989 F.2d 28, 32 (1st Cir. 1993)
(no error when district court accepted co-defendant's guilty plea
after government completed presentation of its case); United Statesv. Del Carmen Ramirez, 823 F.2d 1, 3 (1st Cir. 1987) (no error when
district court accepted co-defendants' guilty pleas during second
day of trial).
 Second, we also reject Owens's fall-back argument that
the district court's jury instructions with respect to Stephens's
sudden absence did more harm than good by highlighting this absence
and thereby suggesting that Stephens had pleaded guilty. The
district court instructed:
 You will note . . . that Mr. Stephens and his
 attorneys are no longer present, and in fact,
 you are not going to be asked anything about
 those charges. That is no longer part of this
 case. You don't speculate about that, don't
 speculate about that in any way. The case now
 is the case of the government, Mr. Dwayne
 Owens and only Mr. Dwayne Owens. You're just
 not going to be asked about Mr. Stephens. 
These instructions are almost identical to jury instructions that
have been approved by this court in similar circumstances. 
See Chapdelaine, 989 F.2d at 32; Del Carmen Ramirez, 823 F.2d at 3. 
Moreover, our system of trial by jury is premised on the assumption
that jurors will scrupulously follow the court's instructions, seeRichardson v. Marsh, 481 U.S. 200, 206 (1987); United States v.
Rivera-Gomez, 67 F.3d 993, 999 (1st Cir. 1995), and we therefore 
assume that the jury, upon hearing the court's instructions,
refrained from speculating about Stephens's absence from the court.
 Third, we reject Owens's claim that the district court
abused its discretion in failing to hold a post-judgment hearing
regarding possible jury taint after a defense investigator reported
that she overheard one juror tell another: "It's a good thing you
remembered about Johnny Stephens." Owens claims that this
statement suggested the juror had been exposed to publicity during
the trial. We disagree. The trial was replete with testimony
concerning Stephens's involvement in the RICO enterprise as well as
evidence concerning Owens's use of "Johnny Stephens" as an alias. 
The juror comment certainly was as likely related to these issues
as it was indicative of jury taint. Indeed, the court asked the
jury throughout trial whether it had been exposed to publicity
about the trial, and the jury consistently denied any such
exposure. Under these circumstances, we cannot say that the
district court's refusal to hold a post-judgment evidentiary
hearing was an abuse of discretion.
 Fourth, the district court did not, as Owens asserts, err
in refusing to excuse a juror for cause when that juror initially
expressed doubt about her ability to fairly consider the evidence,
but ultimately stated that she would try to do so. "There are few
aspects of a jury trial where we would be less inclined to disturb
a trial judge's exercise of discretion, absent clear abuse, than in
ruling on challenges for cause in the empaneling of a jury." 
United States v. Gonzalez-Soberal, 109 F.3d 64, 69-70 (1st Cir.
1997). We see no clear abuse in the court's refusal to dismiss the
juror.
 Finally, the district court did not, as Owens contends,
err in refusing to define reasonable doubt in its instructions to
the jury. It is well established that courts are not required to
define the concept of reasonable doubt. See Victor v. Nebraska,
511 U.S. 1, 5 (1994) ("[T]he Constitution neither prohibits trial
courts from defining reasonable doubt nor requires them to do so as
a matter of course."); United States v. Whiting, 28 F.3d 1296, 1303
(1st Cir. 1994) ("This circuit has repeatedly refused to require
the district courts to define 'reasonable doubt' in their
instructions to the jury.") (citing cases). Nor did the court
impermissibly dilute the reasonable doubt standard with the
instructions it did provide the jury. 
 VI. Conclusion
 For the foregoing reasons, we affirm Dwayne Owens's
convictions in all respects.
 Affirmed.