**UNITED STATES, Appellee,**

v.

**George CHAPDELAINE, Defendant, Appellant.**

No. 92–1358.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1992.

Decided March 25, 1993.

Rehearing and Rehearing En Banc Denied May 4, 1993.

Louis F. Robbio with whom Robbio &
Nottie, Ltd., Providence, RI, was on brief,
for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty.,
with whom Lincoln C. Almond, U.S. Atty.,
and James H. Leavey, Asst. U.S. Atty.,
Providence, RI, were on brief, for appellee.

Before SELYA, CYR and BOUDIN,
Circuit Judges.

BOUDIN, Circuit Judge.

George Chapdelaine appeals following
his conviction for numerous offenses aris-
ing out of the planned robbery of a Wells
Fargo truck by himself and others at the
Emerald Square Mall in North Attleboro,
Massachusetts. The plan was frustrated
when the truck left the location earlier
than usual. Chapdelaine was convicted af-
ter trial while his accomplices pled. We
affirm.

## I. THE EVENTS

Acting on an informant's tip, federal
agents and state and local police on March
3, 1991, followed Chapdelaine and Anthony
Fiore to a meeting with Edward Mahan and
George Whalen in Walpole, Massachu-
setts.[1] The next day, March 4, Chapde-
laine, Fiore, and Mahan drove Mahan's ve-
hicle to a parking lot in Canton, Massachu-
setts. When they left, Fiore was driving a
Wagoneer jeep later reported stolen from
the lot. The Wagoneer was taken to a

garage in Walpole, outfitted with a false
registration plate, and then driven by Fiore
(accompanied by Chapdelaine in another
car) to a parking lot in North Providence,
Rhode Island, where it was left. Fiore
later lodged a stolen Jaguar in a different
parking lot in Warwick, Rhode Island.

On March 25, Chapdelaine and Fiore ar-
rived in separate vehicles at the Emerald
Square Mall in North Attleboro, Massachu-
setts. There, Fiore got into Chapdelaine's
car and the two drove around the mall
before leaving. A few hours later, the two
men returned to the mall in Fiore's Plym-
outh, this time accompanied by Mahan and
Whalen. The Plymouth was parked near a
BayBank branch bank located in the mall,
and Fiore and Mahan watched a Wells Far-
go truck as it arrived at the bank and was
loaded by a guard. The following day,
March 26, Fiore returned alone to the mall,
spent a short period of time, and then left
without having made any purchases.

The next day, March 27, Chapdelaine and
Fiore drove to a department store parking
lot in Taunton, Massachusetts, where they
remained in their car as the same Wells
Fargo truck which served the Emerald
Mall BayBank arrived to serve the depart-
ment store. When the truck crossed the
street to a nearby bank, Chapdelaine and
Fiore moved their car to a spot closer to
the bank. After the truck left the bank,
the two men drove back to the Emerald
Mall parking lot before going home. They
returned the following day, March 28, to
the lot in Taunton, where they again waited
in their car until the Wells Fargo truck
arrived and departed.

The next morning, March 29, Chapde-
laine and Fiore made another brief visit to
the Emerald Mall parking lot before pro-
ceeding to a parking lot in Cumberland,
Rhode Island, to drop off the stolen Jag-
uar. They then picked up the stolen Wago-
neer, now in Fiore's garage and bearing
yet another registration plate, and drove it
to the Cumberland lot. Later all four men
met at the Cumberland lot. There, Chapde-

---

1. Several law enforcement officers who partici-
pated in surveillance of the four men testified at
trial to the group's activities.

laine opened the trunk of his car, put on gloves, handed another pair of gloves to Whalen, and removed from the trunk a green laundry bag which was then placed in the Wagoneer. The group then drove the stolen vehicles and Fiore's Plymouth to the Emerald Mall parking lot. As the men entered the mall lot at 1:27 p.m., they were passed by the Wells Fargo truck on its way out; the truck's normal arrival time at the mall was 2 p.m. but this was Good Friday, and several of the truck's usual stops were closed. The four men pulled into a parking garage, remained there for a few minutes, and then drove back to the staging area in Cumberland.

In Cumberland, all four were arrested. The Wagoneer, which Chapdelaine was then driving, had to be turned off with a screwdriver because the steering column was pulled back and there was no key in the ignition. A subsequent search of the vehicles turned up the green laundry bag (now in Fiore's Plymouth) which was found to contain firearms (including a .357 Magnum with an obliterated serial number), ammunition, a make-up kit, a black wig and a washcloth. Other items seized from the vehicles included gloves, several pieces of clothing, a make-up removal kit, and a police scanner and radio guidebook. Later that day, in a search of Chapdelaine's home in Woonsocket, Rhode Island, agents found five .357–caliber bullets in his bedroom closet and $22,000 in cash under his bed.

All four men were indicted. Fiore and Mahan pled guilty prior to trial.[2] Whalen, tried together with Chapdelaine, entered a guilty plea shortly before the close of the government's case. Chapdelaine was convicted of conspiracy under 18 U.S.C. § 371 to rob a federally insured bank and to commit four other, related offenses; of two Hobbs Act violations, 18 U.S.C. § 1951; of attempting to rob a federally insured bank, 18 U.S.C. § 2113(a); of using and carrying firearms during a crime of violence, 18 U.S.C. § 924(c)(1); of transporting a stolen vehicle in interstate commerce, 18 U.S.C. § 2312; and of four firearms-related offenses, 18 U.S.C. § 922.

After trial, the district court vacated the conviction on one of the firearms counts because Chapdelaine's name had been inadvertently omitted from that count in a superseding indictment used at trial. On all counts but one, Chapdelaine was sentenced to concurrent sentences, the longest being 78 months' imprisonment; on the conviction for carrying a firearm during a crime of violence, the court imposed the five-year consecutive prison sentence made mandatory by 18 U.S.C. § 924(c). This appeal followed.

## II. THE TRIAL

*Publicity and Jury Prejudice.* Chapdelaine first contends that the district court erred in denying his informal motion for a change of venue on grounds of prejudicial pretrial publicity. As evidence of prejudicial coverage, Chapdelaine points to articles in the *Providence Journal* newspaper and to local television coverage, which he says was inflammatory. Since Chapdelaine does not describe the content of the television reports, nor allege that the reports were seen by any of the jurors, we have no basis for evaluating his complaint about televised coverage.

As for the newspaper articles, they are largely factual accounts of the arrests of the four men and subsequent guilty pleas of Fiore and Mahan.[3] On the day trial began, the district judge questioned each of the jurors and alternates, who had been empaneled two months before, to determine whether they had discussed the case, been approached or read or heard anything about it. Only four of the panel, two of whom ultimately deliberated, answered in the affirmative; each had been exposed to a November 20, 1991 *Provi-*

---

2. Fiore's appeal from his sentence has been previously decided. *United States v. Fiore,* 983 F.2d 1 (1st Cir.1992).

3. One of the articles mentions Chapdelaine's prior conviction for cocaine trafficking and an informant's claim that Chapdelaine and Fiore had earlier tried to rob another armored car. There is no indication that any juror saw this article or knew these supposed facts.

*dence Journal* article indicating that two of the defendants had pleaded guilty before trial. All four of the panel members affirmed that they could be impartial. Neither Chapdelaine nor Whalen challenged any of the four for cause.

There is no basis on this record for any claim of "widespread, highly inflammatory publicity." *United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir.), *cert. denied*, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987). The only issue is whether juror knowledge of guilty pleas by co-defendants is information so searing that failure to excuse the juror for cause is plain error, even though the trial judge found the jurors to be impartial. The voir dire did not in this instance reflect a "pattern of deep and bitter prejudice," *Irwin v. Dowd*, 366 U.S. 717, 726, 81 S.Ct. 1639, 1644, 6 L.Ed.2d 751 (1961), compelling the court to override the juror's claim of impartiality. We do not think juror bias is inherent in the knowledge that a co-defendant has pled. *Hines v. United States*, 131 F.2d 971, 974 (10th Cir.1942). *Cf. Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (juror knowledge of defendant's prior convictions).

There is even less basis for Chapdelaine's complaint that some of the seated jurors had relatives in law enforcement or were familiar with some of the trial participants or their families. Chapdelaine was entitled to challenge jurors for cause or to argue on appeal that it was plain error not to excuse a juror. But here no specifics are offered in his brief, so there is no error to assess. As for the claim that trial counsel was ineffective in failing to challenge jurors, that issue is not normally open on direct appeal and must await a collateral attack, if Chapdelaine chooses to make one. *See United States v. Arango–Echeberry*, 927 F.2d 35, 39 (1st Cir.1991).

*Whalen's Guilty Plea.* As the government was completing the presentation of its case, Whalen pled guilty (outside the presence of the jury) and withdrew from the trial. This prompted a motion for mistrial from Chapdelaine, which the district court denied. Chapdelaine's position then,

renewed now, was that the jury would conclude from Whalen's absence that he had pled guilty and would draw the further inference that Chapdelaine, as an alleged co-conspirator, must be guilty as well.

We addressed this issue in *United States v. Del Carmen Ramirez*, 823 F.2d 1 (1st Cir.1987). The district court in that case, faced with the same situation, declined to declare a mistrial but gave a cautionary instruction to the jury. We approved this approach, stating that the court should "clearly and carefully instruct the jury to consider the evidence against a particular individual, alone, and to determine guilt or innocence on that basis." *Id.* at 3. In this case, the district court delivered an instruction almost identical to the one we approved in *Del Carmen Ramirez:*

> Members of the Jury, you'll note that Mr. Whalen is no longer sitting at counsel table and he is no longer a party to this action. You are not, I repeat, you are not to speculate, surmise in any way whatsoever why he is not here. It's none of your concern; it's not part of your deliberations; you will not even discuss the matter as we go forward. The case stands here with Mr. Chapdelaine as the defendant. Is anyone going to have a problem with that? If so, speak up now. I can't stress to you the importance of fairness, objectivity, total impartiality and I stress that again and I stress to you why he is not here is none of your concern; it has nothing to do with your deliberations in this case in any way whatsoever.

Chapdelaine now says that the instruction should have been repeated in the closing charge to the jury. At trial, he made no such request and the failure to do so was not plain error.

*Sufficiency of the Evidence.* Chapdelaine next claims that the evidence at trial was insufficient to prove conspiracy, attempted robbery, various firearms-related offenses, and interstate transportation of a stolen vehicle. In assessing these claims, reasonable inferences and credibility judgments are taken in the light most

favorable to the verdict; and the issue is whether a rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991).

Beginning with conspiracy, Chapdelaine says that the evidence did not prove an intent to commit robbery. This is not a serious argument. The evidence described at the outset of this opinion, a sketch that omits further incriminating detail, could easily persuade a reasonable jury that Chapdelaine and his associates "cased" the BayBank branch and the armored truck, positioned stolen vehicles for an escape, acquired weapons and disguises, arrived at the scene ready to commit the crime and were frustrated only by an accidental change in the truck's schedule. *United States v. Buffington,* 815 F.2d 1292 (9th Cir.1987), where the Ninth Circuit found the evidence inadequate, involved far less aggravated facts.

■ This same evidence supported Chapdelaine's conviction for attempted robbery. To prove attempt, the government must establish both an intent to commit the substantive offense and a "substantial step towards its commission," *United States v. Figueroa,* 976 F.2d 1446, 1459 (1st Cir. 1992), comprising "more than mere preparation" but "less than the last act necessary before the actual commission of the substantive crime." *United States v. Manley,* 632 F.2d 978, 987 (2d. Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Chapdelaine argues that the group's actions amounted to no more than mere preparation because the defendants did not leave their vehicles or make a move toward the bank. In *Del Carmen Ramirez* we found that a group's conduct in "casing the bank, stealing a car, and arriving armed at the bank shortly before the Wells Fargo truck was to arrive" constituted a substantial step toward robbery. 823 F.2d at 2. *See also United*

*States v. Johnson,* 962 F.2d 1308, 1310–11, 1312 (8th Cir.) (same result under similar facts), *cert. denied,* —— U.S. ——, 113 S.Ct. 358, 121 L.Ed.2d 271 (1992). That describes the activity in this case, and we have no reason to reach a different result.[4]

Turning to the firearms-related offenses, Chapdelaine was convicted of using firearms during and in relation to a crime of violence, possession of firearms and ammunition after a felony conviction, and interstate transportation of a firearm with an obliterated serial number. In addition to the guns and ammunition recovered from the green laundry bag, police also seized five rounds of ammunition from Chapdelaine's bedroom closet. The ammunition recovered from the closet formed the basis of a separate count.

■ Chapdelaine's argument on appeal is two-fold. First, he says that the evidence did not show that he "knowingly" possessed the guns found in the laundry bag because there was no proof that he looked inside the bag. At trial, Chapdelaine testified that he thought the bag contained a tire jack and car tools. Noting that the bag was recovered from Fiore's Plymouth instead of the Wagoneer, Chapdelaine argues that the evidence did not exclude the possibility that, unbeknownst to him, guns were substituted for the jack and tools when the bag was transferred from the Wagoneer to the Plymouth. In this case, involving a carefully planned armed robbery with abundant weapons, we think the jury could reasonably infer that the bag's contents when seized were the same as when Chapdelaine handled the bag hours before, and that Chapdelaine knew that the bag contained firearms. *See United States v. Arango–Echeberry,* 927 F.2d at 38.

■ Second, Chapdelaine argues that the evidence failed to prove his "possession" of the firearms in the laundry bag

---

**4.** In a related argument, Chapdelaine contends that the jury instruction on what is "a substantial step" was inadequate. The objection was not raised at trial and we are not told what was wrong with the instruction other than that "a more complex and detailed instruction was re-

quired." We therefore consider the claim waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (issued raised in a perfunctory manner are deemed waived), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

and the ammunition found in his bedroom closet. Chapdelaine's handling of the laundry bag adequately established his possession of the weapons within.[5] As for the bullets in his closet, Chapdelaine emphasizes that the owners of the house where he rented a room were gun dealers who testified to storing ammunition throughout the home. However, the bullets retrieved from Chapdelaine's closet were in an area within his "dominion and control." Further, they matched those found in the .357 Magnum recovered from the laundry bag. This was enough to prove that Chapdelaine was at least in "constructive possession" of the ammunition in his closet. *See United States v. Garcia,* 983 F.2d 1160, 1164–65 (1st Cir.1993); *United States v. Wight,* 968 F.2d 1393, 1397–98 (1st Cir.1992).

Chapdelaine's last attack on the evidence requires little comment. He says that a rational jury could not convict him of knowingly transporting a stolen vehicle across state lines because, as he testified at trial, he did not realize the Wagoneer was stolen. But of course the jury was entitled to disbelieve his testimony, and Chapdelaine does not otherwise contest the government's proof. That proof included (in addition to that summarized at the outset) evidence that Chapdelaine possessed tools commonly used by car thieves and Chapdelaine's own admission that he used a screwdriver to start the Wagoneer.

*The Flaw in the Indictment.* Chapdelaine's next claim of error is the most serious: he was mistakenly convicted of an offense for which he was not indicted. The count at issue charged interstate transportation of a stolen firearm, a Colt .45 caliber pistol seized from the green laundry bag. Chapdelaine was in fact initially named in this count in the original indictment handed down by the grand jury.

Probably by accident, Chapdelaine's name was omitted from the count in a superseding indictment.

The omission escaped the attention of the prosecutor, Chapdelaine's defense counsel, and the trial judge, all of whom proceeded as if Chapdelaine were still charged in the count. At trial, Chapdelaine's counsel and the government stipulated that the Colt was stolen, and there was evidence that he knowingly transported it across state lines. The district court charged the jury on the stolen firearm count and it was included in a redacted indictment given to the jury to reflect only counts naming Chapdelaine. In preparing the pre-sentence report, the probation officer discovered the error. The district court then vacated the conviction on the stolen firearm charge but denied a motion by Chapdelaine for a new trial on all counts.

We are not cited to any precedent directly addressing this issue.[6] The important fact conveyed to the jury, Chapdelaine's possession of the weapon, was admissible as "intent" evidence on several other counts, whether or not possession was charged as an offense. The stipulated fact that the gun was stolen may not have been admissible on the other counts, but if so the prejudicial force of this point was very faint, as other evidence showed multiple weapons, two stolen cars, an obliterated serial number and ample planning. The jury was instructed to separate the evidence as to each count, and its verdict—including the acquittal of Chapdelaine on two counts relating to the stolen Jaguar—suggests that it did just that.

## III. SENTENCE

Chapdelaine's final challenge is to sen-

---

5. As for the question of the guns' use in relation to the crime, the jury could readily have concluded that, by transferring the guns to the Wagoneer before setting off for the mall with the others, Chapdelaine "intended to have [the weapons] available for possible use during or immediately following" a robbery. *United States v. Payero,* 888 F.2d 928, 929 (1st Cir. 1989).

6. The closest in point is *Chow Bing Kew v. United States,* 248 F.2d 466 (9th Cir.), *cert. denied,* 355 U.S. 889, 78 S.Ct. 259, 2 L.Ed.2d 188 (1957). The Ninth Circuit there dismissed a conviction on a count in which the defendant was not named while leaving intact a conviction on another charge. The question of whether the former conviction invalidated the latter was apparently not raised.

tencing calculations.[7] First, as to the counts charging interstate transportation of the stolen Wagoneer, he objects to including the value of the stolen Jaguar and to a two-level enhancement in his base offense level for more than minimal planning. These computations were made in the presentence report, without objection by Chapdelaine. Whether or not these computations were error (Chapdelaine was not convicted of the counts relating to the stolen Jaguar), his sentence was not affected by these two calculations. Pursuant to the guidelines, the district court disregarded the stolen car counts and set Chapdelaine's offense level solely on the basis of the grouped robbery counts. U.S.S.G. § 3D1.4(c). It then sentenced Chapdelaine at the low end of the guideline range due to his age. Adjustments to the stolen car counts simply did not figure into Chapdelaine's sentence.

 Next, Chapdelaine complains of the computation on the robbery counts. The guideline for robbery calls for a four-level increase for losses ranging from $800,000 to $1,500,000. U.S.S.G. § 2B3.1(b)(6). Where as here an attempt or conspiracy is at issue, "intended" loss is the test.[8] At sentencing, over Chapdelaine's objection, the court imposed a four-level increase in his base offense level for a "loss" of $1,000,000—the approximate amount of money contained in the Wells Fargo truck when it stopped at the Bay-Bank on the day Chapdelaine and the others were arrested.

Chapdelaine contends that the loss in this case was speculative because no robbery actually occurred. However, "[i]n an attempted theft, the value of the items that the defendant attempted to steal would be considered." U.S.S.G. § 2X1.1, application note 2. The requirement in section 2X1.1(a) of "reasonable certainty" "goes to what with reasonable certainty can be determined to be the conspirator's intent." *United States v. Medeiros*, 897 F.2d 13, 18 (1st Cir.1990).

 Finally, Chapdelaine invokes section 2X1.1(b), which directs the sentencing court to decrease by three levels the offense level for an attempt or conspiracy *unless* the defendant or conspirators were "about to complete" the underlying offense "but for the apprehension or interruption by some similar event beyond [the defendant's or conspirators'] control." U.S.S.G. §§ 2X1.1(b)(1), (2). The district court in this case declined to grant the reduction because it found that the robbery was frustrated "simply because the ... truck arrived earlier than usual." On appeal, Chapdelaine disputes the correctness of this finding while the government naturally urges us to uphold the district court.

We affirm the district court's conclusion that on the present facts Chapdelaine was not entitled to the reduction. The evidence showed that Chapdelaine and the others arrived at the mall prepared and equipped to carry out a robbery and were thwarted only by the unexpected early departure of the Wells Fargo truck. Under these circumstances, there was no clear error in the district court's conclusion that Chapdelaine was "about to complete" a robbery "but for apprehension or interruption by some similar event beyond the defendant's control." U.S.S.G. § 2X1.1(b)(1). *See United States v. Johnson*, 962 F.2d at 1313–14 (upholding denial of the reduction under similar facts).

 Chapdelaine argues that the reference in section 2X1.1(b) to an interruption "similar" to apprehension excludes offenses that are prevented by fortuitous

---

7. Although the 1991 Sentencing Guidelines were in effect at the time of Chapdelaine's sentencing, the district court applied the 1990 guidelines in effect at the time of the offenses, a result more favorable to Chapdelaine. *See United States v. Harotunian*, 920 F.2d 1040, 1041–42 (1st Cir. 1990). All references in this opinion are to the 1990 guidelines.

8. U.S.S.G. § 2B3.1, application note 3, cross-references section 2B1.1 for "valuation of loss" in robbery offenses. Section 2B1.1, application note 2, refers the judge to section 2X1.1 in cases of "partially completed conduct." Section 2X1.1 sets the base offense level as that fixed for the object offense (in this case, robbery), "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

events like the premature departure of the Wells Fargo truck. In our view, the guideline reflects a policy decision that conspiracies and attempts should be treated like substantive offenses for sentencing purposes if the substantive offense was nearly completed, and the defendant did not voluntarily withdraw. The Sentencing Commission likely believed that near accomplishment of the criminal object normally poses enough risk of actual harm, and reveals enough culpability, as to justify the same punishment that would be imposed for a completed offense. It is nearness of the crime to achievement—not the precise nature of the involuntary interruption—that defeats the reduction available for conspiracies and attempts that have not progressed very far. This one progressed far enough.

The judgment of conviction and sentence are *affirmed*.