# United States Court of Appeals
## For the First Circuit

No. 22-1929

UNITED STATES OF AMERICA,

Appellee,

v.

SHAUN WALKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Gelpí, Montecalvo, and Rikelman,
Circuit Judges.

Sarah Varney, with whom Darren Griffis and Murphy & Rudolf, LLP were on brief, for appellant.

Alexia R. De Vincentis, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

December 19, 2023

**RIKELMAN**, <u>**Circuit Judge**</u>.  Shaun Walker appeals his thirty-six-month sentence for participating in a thwarted Hobbs Act conspiracy to rob a home business.  Walker raises four procedural objections to his sentence, including the application of economic-loss and dangerous-weapon enhancements, and the denial of incomplete-conspiracy and mitigating-role reductions.  Although the district court's ultimate sentence was one month below the low-end of the sentencing range recommended under the United States Sentencing Guidelines, Walker asks us to review the calculation of the range itself.

After careful consideration, we find no reversible error in the district court's treatment of the economic-loss and dangerous-weapon enhancements or the incomplete-conspiracy reduction.  But because the sentencing court did not compare Walker's culpability to that of his co-defendants under the factors applicable to the mitigating-role reduction, we cannot confirm whether it erred in denying that reduction.  Accordingly, we vacate and remand for resentencing on Walker's eligibility for a mitigating-role reduction.

# I.    BACKGROUND

## A.    Relevant Facts[1]

On March 18, 2019, Junior Melendez was organizing a robbery of a home in Rockland, Massachusetts, out of which Joseph Wilson ran a business selling glass marijuana-smoking paraphernalia. Melendez was planning the break-in with Grace Katana, who had scouted the target location, Keith Johnson, who would lead the break-in, and a fourth person, who would aid Johnson inside the home. On March 19, Melendez told Johnson that Shaun Walker would enter the home with Johnson as a substitute for the original person in that role. Johnson objected at first, preferring someone physically larger, before relenting to Walker's participation, telling Melendez, "I'm going in first, it doesn't even matter."

With the four participants set, the plan was put into motion. On March 21, Katana suggested to Melendez that the robbery could go forward that Sunday. Two days later, on Saturday, March 23, Melendez called Johnson and confirmed they would proceed

---

[1] Because Walker pleaded guilty, our summary "draw[s] the facts from the change-of-plea colloquies, the unchallenged portions of the Presentence Investigation Report[], and the sentencing hearing transcript." United States v. Vargas-Martinez, 15 F.4th 91, 95 n.1 (1st Cir. 2021). It also draws on phone call transcripts in the Government's Supplemental Appendix, which contain undisputed statements not included elsewhere in the record but which both parties agree were properly before the district court.

"tomorrow." On Sunday, March 24, Melendez informed Johnson they would commit the robbery "tonight around 2 or 3 in the morning," and Johnson said he would be ready.

Around 1:42 a.m. on Monday, March 25, Katana told Melendez he was ready to proceed "whenever the guys were ready," and agreed to meet Melendez near Hamilton Street in Worcester, Massachusetts. But Melendez changed his mind twenty minutes later, calling Katana at 2:04 a.m. to delay the break-in until "tomorrow," saying the middle of the night was "not really the best time to do it" and agreeing to meet Katana that night instead.

Apparently unknown to the conspirators, state and federal law enforcement had been intercepting Melendez's phone calls and text messages pursuant to a wiretap since March 14, 2019. Aware of Melendez and Katana's middle-of-the-night plan, police watched from a distance in the early hours of March 25 as Melendez arrived to meet Katana in Worcester. At approximately 3:15 a.m., after Melendez had left the area, police observed three men loading a wheeled dolly into the back of a Honda CR-V registered to Katana's sister.[2]

Before the four men left for Rockland later on Monday, March 25, Johnson called Melendez to ask, "you got the thing, or I bringing mine?" Melendez responded that "he might not, he

_____

[2] The record does not further identify the men.

- 4 -

probably not even be there," apparently referring to Wilson, but instructed Johnson to "bring [his] just in case," repeating, "just bring one, bring one." The men were discussing whether Johnson should carry a firearm, and, following Melendez's instructions, Johnson brought a .380 caliber pistol to Rockland. Law enforcement agents were listening to that call and intercepted a separate call the following month in which Melendez told a third party that Walker was angry that nobody told him Johnson was instructed to bring a gun into the home.

The men traveled more than 60 miles from Worcester to Rockland on Monday afternoon. Upon arriving in Rockland around 2:48 p.m., Melendez and Katana scoped out the Wilson property, whereas Walker and Johnson waited in a Home Depot parking lot less than a mile away. At 2:51 p.m., location information from Melendez's phone indicated he was close to the target home. At 2:53 p.m., a doorbell camera recorded Katana carrying away two packages that had been delivered to the doorstep of the property earlier that day.

By 3:02 p.m., Melendez and Katana had arrived at the Home Depot. Although Melendez previously had instructed Walker to purchase from Home Depot "whatever we need" while Melendez and Katana went to the house, Walker asked Melendez to buy the supplies instead, saying "we can't be going in and showin' our face," and suggesting Melendez "grab a crowbar," before adding "what you

think?  Whatever, whatever you think's going to work."  Home Depot security footage and a purchase receipt show that at 3:07 p.m., Melendez and Katana bought a two-foot iron crowbar, an eight-inch screwdriver, and razor blades, which they loaded into the Honda occupied by Walker and Johnson.

Melendez also told Walker "[t]here's one whip [car]" in the driveway of Wilson's house and that Katana did not "think anybody [was] there" but that they were "not sure."  Apparently, Katana was trying to gather more information from an unspecified fifth person.  Melendez's last statement to Walker was that "we[']re gonna look . . . and make the decision after that."

Convinced an armed robbery was imminent, Massachusetts State Police stopped both vehicles in the Home Depot parking lot.  Walker was driving the Honda with Johnson in the front passenger seat.  From that vehicle, officers seized a loaded .380 caliber pistol from the glove compartment; the crowbar Melendez and Katana had purchased; and the wheeled dolly loaded the night before.  In Melendez's vehicle, officers found a ski mask and the two boxes Katana had taken from the front steps of the home, which contained $2,500 worth of glass smoking pipes.  Wilson later told law enforcement that the glassware in his home on the day of the intended robbery was worth approximately $40,000.

## B. Legal Proceedings

On May 18, 2022, Walker pleaded guilty to violating the Hobbs Act, 18 U.S.C. § 1951(a). The presentence investigation report (PSR) recommended a sentencing range of thirty-seven to forty-six months based on a total offense level of 21, which was derived from the following calculation. The Guideline applicable to Hobbs Act conspiracies is that for "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)." U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 2X1.1; see id. § 1B1.2 ("If the offense involved a conspiracy . . . refer to § 2X1.1 . . . ."). Section 2X1.1 borrows the base offense level for the substantive offense -- here, the robbery Guideline, id. § 2B3.1 -- "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty," id. § 2X1.1(a). The robbery Guideline provides a base offense level of 20. Id. § 2B3.1(a).

The PSR also recommended two enhancements and two reductions. It initially recommended a five-level increase for possession of a firearm, but both Walker and the government objected because the government was unable to prove Walker could have reasonably foreseen that Johnson would carry the gun. In response, the probation officer recommended instead a three-level enhancement based on possession of "dangerous weapon[s]": the crowbar, screwdriver, and razor blades. Id. § 2B3.1(b)(2)(E).

The PSR also recommended a one-level economic-loss increase because the intended loss was more than $20,000 but did not exceed $95,000. See id. § 2B3.1(b)(7)(B). Finally, the PSR recommended a two-level decrease for acceptance of responsibility and a further one-level decrease for Walker's timely notice of his intent to plead guilty, reaching a total offense level of 21. Because Walker had a criminal history score of zero, he qualified for criminal history category I.

Walker asserted four objections to the PSR's guideline calculation in his sentencing memorandum. First, he requested a four-point reduction for his role as a minimal participant in the conspiracy. See id. § 3B1.2(a). Walker argued that he was "substantially less culpable than the average participant" in the conspiracy, id. § 3B1.2 cmt. n.3(A), and "plainly among the least culpable" in the offense under the factors laid out in the Guideline commentary, id. § 3B1.2 cmt. n.4; see also id. § 3B1.2 cmt. n.3(C) (listing factors "the court should consider" when determining whether defendant is eligible for a reduction). He explained that he did not fully understand the scope or structure of the activity, nor did he participate in its planning; he intended to perform only a small role in the break-in itself; he lacked decision-making authority and expressed reticence about certain steps; and the record did not show that he stood to benefit

- 8 -

from his participation. At the sentencing hearing,[3] the government responded that Walker could not be a minimal participant, arguing that it was "hard to imagine that an individual who ultimately agreed . . . to go into the house to actually commit the robbery [would] be a minimal participant in that conspiracy." The government also argued that Walker hesitated to enter the Home Depot because he feared a witness might later identify him on security footage, not because he was having second thoughts about the robbery.

Second, Walker requested a three-level reduction because he and his co-conspirators had not taken all the necessary acts to complete the robbery. See id. § 2X1.1(b)(2). Walker argued that Melendez had doubts about whether to carry out the robbery as late as when the group was at Home Depot because Katana could not determine whether the home was occupied. Walker further argued that the group had not reached the final staging area because Melendez had asked Walker whether the group could meet at a restaurant to decide what to do. The government responded that the incomplete-conspiracy reduction was "the exception to the rule" and unwarranted in this case, when the co-conspirators had planned the robbery for six days, armed themselves with a pistol,

---

[3] The government did not file a sentencing memorandum.

driven 60 miles to within half a mile of the target property, and purchased items to perform the break-in.

Third, Walker argued that a three-level dangerous-weapon enhancement for possession of the crowbar, screwdriver, and razor blades was improper because he possessed the items only with the intent to facilitate the robbery, not to cause injury. The government argued that the enhancement was available as long as it could show with reasonable certainty that Walker intended to "possess[] an item that was capable of inflicting death or serious bodily injury," and both parties agreed the crowbar, screwdriver, and razor blades could inflict such harm.

Finally, Walker argued that the one-point economic-loss enhancement was inappropriate. He contended that the court could consider only the actual loss caused by the conspirators, not the intended loss, because the government could not show with reasonable certainty that the conspirators would have stolen all of the glassware had the break-in occurred. The actual loss of $2,500 would not have warranted an enhancement. See id. § 2B3.1(b)(7)(A). The government responded that the conspiracy Guideline indicates that "in an attempted theft, the value of the items that the defendant attempted to steal would be considered," id. § 2X1.1 cmt. n.2, so the intended $40,000 loss was sufficient to justify the adjustment.

The district court allowed the parties to present their positions without questioning and, at the end of the presentations, decided to adopt the PSR's offense level calculations. It did not explain its reasoning on the record. The government asked for a sentence of forty-six months of imprisonment, at the top of the sentencing range recommended under the Guidelines, whereas Walker requested no incarceration, two years of probation, and three years of supervised release.[4] After hearing Walker's allocution, which the district court remarked "was one of the best [it had] ever heard," the court sentenced him to thirty-six months' incarceration and three years' supervised release. Walker timely appealed.

## II. DISCUSSION

### A. Standard of Review

On appeal, Walker raises only procedural challenges to his sentence. Accordingly, our review of the district court's decision scrutinizes its legal conclusions de novo and its factual findings for clear error. See United States v. Andino-Rodríguez, 79 F.4th 7, 31 (1st Cir. 2023). We address each of Walker's challenges below, leaving the most complicated on this record for last.

---

[4] Walker's sentencing memorandum noted that he spent more than three years in court-ordered home confinement after his initial arrest in 2019, during which he left home only for work and to attend to his children.

- 11 -

## B.    Economic-Loss Enhancement

Walker asks us to reverse the district court's application of a one-point economic-loss enhancement on two grounds.  He argues that the district court committed legal error by applying the enhancement based on the $40,000 value of the intended loss, rather than the $2,500 value of the glassware Katana removed from the property.  See U.S.S.G. § 2B3.1(b)(7)(A)-(B) (applying no enhancement for losses of $20,000 or less and a one-point enhancement for losses greater than $20,000 but not exceeding $95,000).  Further, Walker contends that the government failed to prove with "reasonable certainty" that the conspirators "specifically intended" to cause a loss of more than $20,000.  We reject both arguments.

First, the plain language of the Guidelines and our precedent both foreclose Walker's claim that the district court applied the wrong legal standard.  The language of the applicable Guidelines allows district courts to consider intended losses. The conspiracy Guideline instructs sentencing courts to apply "any adjustments from [the substantive offense] guideline for any intended offense conduct that can be established with reasonable certainty."  Id. § 2X1.1(a) (emphasis added).  The conspiracy Guideline commentary defines "intended offense conduct" as conduct

that was "specifically intended" or that "actually occurred."[5]  Id. § 2X1.1 cmt. n.2.  Under the robbery Guideline commentary, "loss" is "the value of the property taken, damaged, or destroyed."  Id. § 2B3.1 cmt. n.3.  Applying the commentary of the conspiracy Guideline to that of the robbery Guideline therefore requires district courts to consider the value of the property that the conspirators specifically intended to steal when sentencing for a robbery conspiracy.  Cf. § 2X1.1 cmt. n.2 ("In an attempted theft, the value of the items that the defendant attempted to steal would be considered.").  And our case law confirms that "'intended' loss is the test" for determining whether an economic-loss adjustment applies to a thwarted robbery conspiracy.  United States v. Chapdelaine, 989 F.2d 28, 35 (1st Cir. 1993).[6]

Walker argues that a case decided by the Third Circuit after his sentencing nevertheless commands a different result here.  See generally United States v. Banks, 55 F.4th 246 (3d Cir.

---

[5] The commentary in the Guidelines, including the application notes, is binding unless it conflicts with the Guidelines themselves or a statute.  Andino-Rodríguez, 79 F.4th at 35 (citing United States v. Carrasco-Mateo, 389 F.3d 239, 244 (1st Cir. 2004)).

[6] Walker argues that Chapdelaine is inapplicable because it considered "intended loss" based on a since-amended provision in the robbery Guideline.  But as we explained in Chapdelaine, the previous framework, in the end, directed us to "intended loss" based on the language in the conspiracy Guideline.  See 989 F.2d at 35 n.8.  The same is true today, even though the modern Guidelines take us on a more direct route to get there.

- 13 -

2022). <u>Banks</u> held that the plain meaning of the economic-loss adjustment under the separate but similar theft Guideline "does not include intended loss." <u>Id.</u> at 257 (interpreting U.S.S.G. § 2B1.1(b)(1)). In so ruling, the Third Circuit withheld deference to the commentary accompanying the theft Guideline because that commentary broadened the language of the Guideline beyond its text. <u>See</u> <u>id.</u> at 256-58 & n.45 (citing <u>United States</u> v. <u>Nasir</u>, 17 F.4th 459, 472 (3rd Cir. 2021) (en banc) (Bibas, J., concurring)). Walker argues that because the adjustments under the theft and robbery Guidelines share the word "loss," the logic of <u>Banks</u> should apply to section 2B3.1(b)(7) and compel us to reverse. But <u>Banks</u> did not involve a conspiracy charge, so the sentence in that case rested only on the language of the theft Guideline. <u>See</u> <u>id.</u> at 251, 256-58. Here, by contrast, the conspiracy Guideline governing Hobbs Act robberies expressly instructs courts to consider "intended offense conduct." U.S.S.G. § 2X1.1(a). And unlike the intended loss language in the theft Guideline commentary, the textual hook for intended conduct in the conspiracy Guideline is contained in the Guideline itself, quelling any concern that the commentary could have impermissibly expanded the meaning of the relevant Guideline here.

Second, there was no error in the district court's application of the reasonable certainty standard. Our precedent allows sentencing courts to draw inferences from "the actual plan

of the conspirators to determine which specific characteristics of the offense they intended." United States v. Medeiros, 897 F.2d 13, 19 (1st Cir. 1990); see Chapdelaine, 989 F.2d at 35 ("[R]easonable certainty goes to what with reasonable certainty can be determined to be the conspirator's intent." (internal quotation marks omitted) (quoting Medeiros, 897 F.2d at 18)).

Walker argues that because the robbery did not take place, it is "speculative" to assume that the conspirators would have successfully stolen more than $20,000 worth of property, thereby warranting the enhancement. Again, our precedent says otherwise. In Chapdelaine, the defendant received a four-point increase for a loss between $800,000 and $1,500,000 for his unsuccessful conspiracy to rob an armored truck containing $1,000,000. See 989 F.2d at 35. The defendant argued on appeal, as Walker does here, that "the loss . . . was speculative," rather than reasonably certain, "because no robbery actually occurred." Id. But we disagreed, discerning no clear error in the finding that the co-conspirators intended to steal all the money in the truck. See id. So too here. Walker argues that the conspirators might not have "kn[own] how much inventory would [have been] inside" or "been able to locate all the inventory" or "had the time and physical ability" to remove it all. But these possibilities support, at best, a plausible alternative finding; they do not demonstrate clear error. See United States v. Flete-

- 15 -

Garcia, 925 F.3d 17, 26 (1st Cir. 2019) ("If two plausible but competing inferences may be drawn from particular facts, a sentencing court's choice between those two competing inferences cannot be clearly erroneous." (first citing United States v. Nuñez, 852 F.3d 141, 146 (1st Cir. 2017); and then citing United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990))).

### C. Dangerous-Weapon Enhancement

Walker next argues that the district court erred by applying a three-point enhancement under the robbery Guideline for possession of dangerous weapons because the government failed to prove that Walker intended to use the crowbar, screwdriver, and razor blades as weapons. Walker is incorrect as a matter of law that the Guidelines require such proof.

As explained previously, the conspiracy Guideline directs courts to adopt the base offense level of the substantive offense "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a). Among the specific offense characteristics of the robbery Guideline is a three-level enhancement if "a dangerous weapon was brandished or possessed." Id. § 2B3.1(b)(2)(E). A dangerous weapon includes "an instrument capable of inflicting death or serious bodily injury." Id. cmt. n.2 (incorporating by reference U.S.S.G. § 1B1.1 cmt. n.1(E)(ii)).

Our precedent does not resolve whether the government must show that a defendant intended to possess a dangerous weapon with intent to use it as such. The government argues that it needs to show only that Walker intended to possess the weapons, whereas Walker argues that the enhancement applies only if he intended to use the items to "inflict[] death or serious bodily injury."

"Typically, we give the language used in guideline provisions its plain and ordinary meaning." United States v. Patch, 9 F.4th 43, 46 (1st Cir. 2021); accord United States v. Pope, 554 F.3d 240, 246 (2d Cir. 2009) (interpreting weapons enhancement according to its "plain meaning"). Section 2X1.1(a) instructs district courts to adjust the Guideline calculation from the underlying substantive offense based on "intended offense conduct." U.S.S.G. § 2X1.1(a). "[I]ntended" modifies "conduct," which, in the relevant sense, means "the act, manner, or process of carrying on." See Conduct, Merriam-Webster's Collegiate Dictionary (10th ed. 1993). Accordingly, "intended offense conduct" in the conspiracy Guideline refers to -- and the specific-intent requirement applies to -- the actions a defendant intended to take in the course of the substantive offense. The text of the robbery Guideline clearly states that the relevant offense conduct is the "possess[ion]" of a dangerous weapon. U.S.S.G. § 2B3.1(b)(2)(E); see Pope, 554 F.3d at 246 (holding enhancement applies under theft Guideline "if the dangerous weapon 'was

possessed'" (quoting U.S.S.G. § 2B2.1(b)(4))).  Because the action is contained in the word "possess[ion]," the plain meaning of the Guidelines supports the government's view that Walker needed only to "specifically intend[]" to "possess[]" the items in connection with the robbery.  See U.S.S.G. § 2X1.1(a) cmt. n.2; id. § 2B3.1(b)(2)(E).

Our understanding of the dangerous-weapon enhancement is consistent with the case law of our sister circuits, and we can identify no out-of-circuit precedent adopting Walker's interpretation.  See United States v. Lavender, 224 F.3d 939, 941 (9th Cir. 2000) (rejecting defendant's argument that "dangerous weapons should be considered dangerous weapons for sentencing purposes only when they are carried with the intent to use them as weapons"); Pope, 554 F.3d at 246 (same regarding the burglary Guideline).  For example, based on the plain meaning of the dangerous-weapon enhancement under the burglary Guideline, the Second Circuit held in Pope that the enhancement itself required the government only to show "possession of a dangerous weapon, regardless of whether the dangerous weapon was employed as such during the commission of a crime."  554 F.3d at 246 (citing Lavender, 224 F.3d at 941).  The defendant in Pope, who had carried a sledgehammer into a bank burglary, maintained that an enhancement for possessing a dangerous weapon was inappropriate because the sledgehammer was "not inherently a weapon," and the defendant had

used it only to break into the bank, not to cause injury. Id. at 245. But the Second Circuit understood the focus of the enhancement to require courts to evaluate whether an item "was possessed," not the manner in which it was used. Id. at 246.

To be sure, Pope did not interpret the enhancement through the lens of the conspiracy Guideline, which expressly limits sentencing courts to considering conduct that was "specifically intended or actually occurred." U.S.S.G. § 2X1.1 cmt. n.2. But Pope's explanation that the dangerous-weapon enhancement applies when the defendant intended to possess a dangerous weapon -- regardless of how the item would be used to facilitate the offense -- confirms our view that the conspiracy Guideline's intent requirement applies to possession of a dangerous weapon and nothing more. See 554 F.3d at 245-46; accord Lavender, 224 F.3d at 941.

Because Walker concedes that he specifically intended to possess the crowbar, screwdriver, and razor blades during the robbery, and that such items fit within the Guideline definition of "dangerous weapon," the district court did not err by applying the enhancement here.

## D. Incomplete-Conspiracy Reduction

Walker next argues that the district court erred by denying his request for a three-level incomplete-conspiracy reduction. The sentencing court's factual finding that the

- 19 -

participants were "about to complete" the conspiracy is subject to clear error review.[7] See Chapdelaine, 989 F.2d at 35. We find no clear error here.

A conspiracy defendant is entitled to a three-level reduction from the base offense level of the underlying substantive offense "unless" the court finds with "reasonable certainty" that "the conspirators were about to complete" the object of the conspiracy "but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(a), (b)(2). Walker argues that at the time of the conspirators' initial arrests in the Home Depot parking lot, Melendez and Katana believed that someone might be home and planned to undertake additional reconnaissance before proceeding, so they were not "about to complete" the robbery. He urges us to reverse, contending that these facts show the conspiracy here did not proceed as far as the robbery in Chapdelaine.[8]

_____

[7] A sentencing court may also deny an incomplete-conspiracy reduction if it finds that "the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense." U.S.S.G. § 2X1.1(b)(2). In that context, "[t]he question of whether the offense was substantially completed is a judgment call," which we review for abuse of discretion. United States v. Serunjogi, 767 F.3d 132, 143 (1st Cir. 2014).

[8] The government, for its part, attempts to distinguish Chapdelaine as a case in which the defendants had completed all the acts necessary to accomplish the robbery, but our holding in that case clearly stated otherwise. See 989 F.2d at 35 ("Under these circumstances, there was no clear error in the district

- 20 -

In that case, we found no clear error in the district court's finding that Chapdelaine was "'about to complete' a robbery" when the participants had stolen getaway vehicles in advance, scouted the arrival and departure times of the target truck for several days, arrived at the mall on the day of the intended robbery "prepared and equipped to carry out a robbery," and "were thwarted only by the unexpected early departure of the [target] truck." Chapdelaine, 989 F.2d at 30-31, 35. Walker contends that the presence of the car in the driveway of the Wilson residence gave the conspirators here pause, forcing them to reconsider whether to proceed. Unlike in Chapdelaine, Walker argues, the conspirators here did not arrive at the final staging area ready to complete the offense. Rather, there was still an opportunity to withdraw from or otherwise abandon the conspiracy.

But Chapdelaine makes clear that "[i]t is nearness of the crime to achievement . . . that defeats the reduction available for conspiracies . . . that have not progressed very far." Id. at 36. And Walker fails to explain why the district court clearly erred in determining that the robbery conspiracy here had "progressed far enough." Id.

_____

court's conclusion that Chapdelaine was 'about to complete' a robbery 'but for apprehension or interruption by some similar event beyond the defendant's control.'" (emphasis added) (quoting U.S.S.G. § 2X1.1(b)(1))).

We reverse for clear error only if the district court's factual findings are not plausible on the record as a whole and if we "form[] a strong, unyielding belief that a mistake has been made." United States v. Montañez-Quiñones, 911 F.3d 59, 66 (1st Cir. 2018) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)). Here, Walker and his co-conspirators planned the robbery for nearly a week, drove more than 60 miles in separate cars from Worcester to Rockland, and, although Melendez and Katana saw a vehicle in the driveway at the target home, stole items from the front porch and then purchased items at Home Depot to facilitate the break-in. A district court could plausibly treat these facts as demonstrating that the presence of a vehicle at the home had merely slowed, rather than stopped, the momentum of the conspiracy. Nor does the record contain any evidence that Walker took steps to withdraw from the conspiracy at that time. Although Walker disagrees with the district court's interpretation of the facts, "the sentencing court's choice among supportable alternatives cannot be clearly erroneous." Andino-Rodríguez, 79 F.4th at 34 (quoting United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 227 (1st Cir. 2018)).

### E.   Mitigating-Role Reduction

Walker's final challenge to his sentence is that the district court erroneously denied him a mitigating-role adjustment for what he claims is his lesser role in the offense as compared

to his co-conspirators.  We conclude that we cannot evaluate on this record whether denying the reduction constituted error and therefore remand to the district court.

"Role-in-the-offense determinations are notoriously fact-specific." United States v. Pérez, 819 F.3d 541, 545 (1st Cir. 2016) (citations omitted).  It is not surprising then that "absent a mistake of law, battles over a defendant's" role are "almost always . . . won or lost in the district court." Id. at 546 (quoting United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995)).  Indeed, "[w]e've often warned that, [b]ecause determining one's role in an offense is a fact-specific inquiry, we rarely reverse a district court's decision regarding whether to apply a minor role adjustment." Andino-Rodríguez, 79 F.4th at 31 (second alteration in original) (internal quotation marks omitted) (quoting De la Cruz-Gutiérrez, 881 F.3d at 225-26).  The defendant "bears the burden of proving, by a preponderance of the evidence, that he is entitled to the downward adjustment." United States v. Arias-Mercedes, 901 F.3d 1, 5 (1st Cir. 2018) (quoting Pérez, 819 F.3d at 545).  Absent a showing of legal error subject to de novo review, "[a] defendant will 'only prevail on appeal by demonstrating that the district court's determination as to his role in the offense was clearly erroneous.'" De la Cruz-Gutiérrez, 881 F.3d at 226 (quoting United States v. González-Soberal, 109 F.3d 64, 74 (1st Cir. 1997)).

"[A]ll parties engaged in a criminal enterprise can be 'located on a continuum.'" Andino-Rodríguez, 79 F.4th at 34 (quoting Arias-Mercedes, 901 F.3d at 8). "Those who are primarily responsible stand on one end," while "the least culpable participants . . . stand at the opposite end." Id. To be eligible for any mitigating-role reduction, a defendant must, as a threshold matter, be "substantially less culpable than the average participant in the criminal activity." United States v. Mendoza-Maisonet, 962 F.3d 1, 23 (1st Cir. 2020) (quoting U.S.S.G. § 3B1.2 cmt. n.3(A)). If that requirement is met, then a district court must evaluate the defendant's classification among the "pool of defendants eligible for an adjustment." Id. A minimal participant is "plainly among the least culpable of those involved," U.S.S.G. § 3B1.2 cmt. n.4 (emphasis added), whereas a minor participant is "less culpable than most other participants in the criminal activity, but [his] role could not be described as minimal," id. cmt. n.5 (emphasis added). A defendant may receive a four-point reduction if he is a minimal participant; a two-point reduction if he is a minor participant; and a three-point reduction if his culpability falls somewhere between minimal and minor. See U.S.S.G. § 3B1.2.

Accordingly, to be a candidate for a minimal-participant reduction (worth four points) Walker must show that he is both "substantially less culpable than the average participant in the

criminal activity" <u>and</u> "plainly among the least culpable of those involved"; and to be a candidate for a minor-participant reduction (worth two points) he must be <u>both</u> "substantially less culpable than the average participant in the criminal activity" <u>and</u> "less culpable than most other participants in the criminal activity." <u>Mendoza-Maisonet</u>, 962 F.3d at 23 (citations omitted); <u>accord</u> <u>Andino-Rodríguez</u>, 79 F.4th at 34. Other circuits apply this conjunctive standard too. <u>See, e.g.</u>, <u>United States</u> v. <u>Carpenter</u>, 252 F.3d 230, 234-35 (2d Cir. 2001); <u>United States</u> v. <u>Kearby</u>, 943 F.3d 969, 977 (5th Cir. 2019); <u>United States</u> v. <u>Dominguez-Caicedo</u>, 40 F.4th 938, 960 (9th Cir. 2022).

We recognize that this framework can pose a challenge for district courts reviewing small criminal enterprises like this one, and comparing participants in a four-person conspiracy can be particularly vexing. By our math, only the two least culpable defendants in a four-person conspiracy could qualify for a two-point reduction by showing that each is "substantially less culpable than the average participant" and "less culpable than most other participants." But we emphasize that the individuals who could qualify as "substantially less culpable than the average participant" in a four-person enterprise will vary based on the facts of a particular case. In some four-person conspiracies, the average participant could be the second-most culpable individual if the most culpable individual's role was significantly greater

- 25 -

than that of all the others. The third and fourth participant might then qualify for a reduction if each was "substantially less culpable" than the second participant. In other four-person conspiracies, the average participant might be the third-most culpable individual, so only the fourth participant could receive a reduction. In all these situations, however, a sentencing court must consider whether the defendant is also "less culpable than most other participants" in a four-person conspiracy in order to grant a minor-role reduction. And there may be instances when none of the participants qualifies. See, e.g., De la Cruz-Gutiérrez, 881 F.3d at 226 (citation omitted) (denying reduction where participants were "equal partners in the criminal activity").

Here, we do not have enough information about the district court's rationale for denying the reduction. Based on the record we can only conclude, as the government conceded at oral argument, that Walker was less culpable than Melendez, the mastermind, and Johnson, who planned to enter the home with a gun. Walker also may be less culpable than Katana, who participated heavily in planning and was the only person to remove glassware from the premises but did not intend to enter the home. But the district court, which is the expert on the facts, particularly after presiding over Katana's trial, at no time identified the

average participant or compared the culpability of Walker and Katana on the record.

The lack of any explanation for the district court's decision gives us special pause here because it is not apparent from the record that the court performed the inquiry required by the mitigating-role Guideline. U.S.S.G. § 3B1.2 cmt. n.3(C) ("[T]he court should consider the following non-exhaustive list of factors." (emphasis added)); see also United States v. Wynn, 37 F.4th 63, 69 (2d Cir. 2022) ("The district judge . . . erred in denying [the defendant] a mitigating role adjustment without first addressing [four] relevant factors that appear to support such an adjustment."); United States v. Diaz, 884 F.3d 911, 916 (9th Cir. 2018) ("[T]he assessment of a defendant's eligibility for a minor-role adjustment must include consideration of the factors identified by the Amendment . . . ."). Since 2015, the Guidelines have channeled decision-making about culpability through five non-exhaustive factors to determine whether a defendant is eligible for a mitigating-role reduction. U.S.S.G. § 3B1.2 cmt. n.3(C); id. Supp. to App. C, Amend. 794. The factors are:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

Id. § 3B1.2 cmt. n.3(C). An evaluation of these factors does not require extensive analysis, see United States v. Castillo, 995 F.3d 14, 18 (1st Cir. 2021), but it does require both a judgment about the defendant's own conduct and a comparison to the other participants, see Andino-Rodríguez, 79 F.4th at 33; United States v. Nkome, 987 F.3d 1262, 1273 (10th Cir. 2021) ("[T]he crux of § 3B1.2 is a defendant's relative culpability." (quoting United States v. Yurek, 925 F.3d 423, 446 (10th Cir. 2019))).

In some cases when a sentencing court gave no explanation on the record for denying a reduction, we have discerned the court's rationale by inferring that the court agreed with the government's reasoning that the reduction was unwarranted. See, e.g., Mendoza-Maisonet, 962 F.3d at 24. Nonetheless, sentencing courts must give sufficient explanation to "allow for meaningful appellate review." Gall v. United States, 552 U.S. 38, 50 (2007); see Wynn, 37 F.4th at 68 (remanding for resentencing because "[t]he district judge's decision lack[ed] any analysis of [four of the] relevant mitigating role factors that the Guidelines provide"); cf. United States v. Reyes-Correa, 81 F.4th 1, 10 (1st Cir. 2023)

(vacating sentence for procedural unreasonableness because district court provided "boilerplate" explanation for upward variance). Thus, although some sentences may survive clear error review based on other information in the record, even without an explicit comparison, we stress that comparing participants based on the Guideline factors is critical. See United States v. Muñoz-Fontanez, 61 F.4th 212, 214 (1st Cir. 2023) ("Inadequate explanation is a recognized sentencing error." (citing Gall, 552 U.S. at 51)).

Against this backdrop, we conclude that we are unable to affirm here for three reasons. First, the district court did not explain its grounds for denying the mitigating-role reduction. After the parties' presentations, the court stated that it would accept the Guidelines calculations recommended in the PSR. Often when we have affirmed the denial of the reduction in previous cases, we have been able to rely on some explanation by the district court. See, e.g., Andino-Rodríguez, 79 F.4th at 33, 35 (affirming the denial of a mitigating-role reduction where "the court went through the five mitigating role adjustment factors and matched Andino's conduct to each factor"); Castillo, 995 F.3d at 18 ("The district court's comparison to Arias-Mercedes and the statements that Castillo must have been aware of the quantity of cocaine on board were sufficient to 'allow for meaningful appellate review' of the denial of the downward adjustment." (quoting Gall,

- 29 -

552 U.S. at 50)). The district court also did not engage with the parties during their presentations in a way that would permit us to understand its reasoning from its comments and questions to counsel. See, e.g., United States v. Montes-Fosse, 824 F.3d 168, 172 (1st Cir. 2016) (district court's "exchange" with defense counsel allowed inference about court's justification for denying reduction).

Second, we cannot rely solely on the government's arguments at sentencing as a basis for affirming. See Mendoza-Maisonet, 962 F.3d at 24. The government argued that it was "hard to imagine that an individual who ultimately agreed . . . to go into the house to actually commit the robbery [could] be a minimal participant in that conspiracy to commit a robbery." It also briefly rejected Walker's suggestion that his reluctance to enter the Home Depot supported the reduction, claiming that Walker simply feared being seen on camera. Unlike in other cases where we have inferred a district court's rationale from the arguments advanced at sentencing, here, the government's argument made no explicit comparison of the relative culpability of any of the defendants. Cf. id. ("At sentencing, the Government argued against the minimal participant reduction, stating that Mendoza had an 'equal participation' in the offense, access to the stolen vehicles -- in one of which an item that belonged to Mendoza was found -- and that he 'had the most dangerous weapon of the two.'"). Instead,

the government addressed "at most one of the Guidelines factors relevant to the mitigating role determination": the extent of Walker's participation in the planned criminal activity. Wynn, 37 F.4th at 68 (vacating sentence because district court considered only a single factor).

Further, although we recognize that Walker focused his arguments at sentencing on the four-level reduction, the government never addressed below the possibility that Walker might qualify as a "minor" participant, even if not a "minimal" one. Our case law suggests, and the government concedes, that district courts "faced with a request for a four-level reduction for a minimal role could reasonably consider, in the course of that analysis, whether a lesser two-level reduction for a minor role had been made out." United States v. Olivero, 552 F.3d 34, 40 (1st Cir. 2009); see also De la Cruz-Gutiérrez, 881 F.3d at 225. So we hesitate to treat the government's arguments as a sufficient basis for the sentencing court's denial of the lesser reductions available under section 3B1.2.

In fact, the possibility that the district court relied on the government's argument heightens the need for clarification here, given that the government's position below may have suggested that Walker was ineligible for any reduction based on his integral role in the conspiracy as "one of the individuals to go into the house to actually commit the robbery." Integral role, however, is

- 31 -

not the correct legal standard. See U.S.S.G. § 3B1.2 cmt. n.3(C) (whether a defendant played "an essential or indispensable role in the criminal activity is not determinative"); see, e.g., United States v. Sanchez-Villarreal, 857 F.3d 714, 722 (5th Cir. 2017) (vacating and remanding where district court denied reduction based solely on defendant's "critical" role in the offense); Diaz, 884 F.3d at 917 ("To the extent the district court's reasoning reflects reliance on [the defendant's] courier conduct as dispositive of [his] eligibility for a minor-role reduction, it was error. Amendment 794 clarified that the performance of an essential role . . . is not dispositive.").

To the extent that the sentencing court relied instead on the PSR's rationale for denying a mitigating-role reduction, we are still not in a position to affirm. As Walker explained at oral argument before us, the PSR declined to recommend any reduction on the ground that "Walker was aware of the plan, agreed to it, and was fully prepared to effectuate the crime but for law enforcement intervention." But the district court's adoption of that reasoning would still fail to satisfy the multifactor factual analysis required by the Guideline.

Third, we cannot confidently conclude that any error in the sentencing court's application of the mitigating-role reduction was harmless. We "may only deem [a sentencing] error harmless 'if, after reviewing the entire record, [we are] sure

- 32 -

that the error did not affect the sentence imposed.'" United States v. Graham, 976 F.3d 59, 62 (1st Cir. 2020) (quoting United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015)). Thus, "resentencing is required if the error either affected or arguably affected the sentence." Id. (quoting Alphas, 785 F.3d at 780).

In conducting harmless error review of a sentence, we look not only to whether the error affected the Guidelines calculation, but also "seek to distinguish between a judge's reliance on facts in selecting an appropriate sentence and a judge's reliance on the significance that the Guidelines appear to assign to those facts." Id. (citing United States v. Goergen, 683 F.3d 1, 4 (1st Cir. 2012)). The district court exercised lenity here by granting a thirty-six-month sentence -- one month lower than the bottom of the recommended range of thirty-seven to forty-six months. Although Walker's thirty-six-month sentence would be within the Guidelines range of thirty to thirty-seven months if he received a two-point reduction on remand, we agree with Walker that this lower Guidelines range could result in a sentence of less than thirty-six months. Thus, we think any error at least "arguably affected the sentence," requiring remand. Graham, 976 F.3d at 62 (quoting Alphas, 785 F.3d at 780).

### III.    CONCLUSION

For these reasons, we **VACATE** and **REMAND** for resentencing consistent with this opinion.